ZEB. V. WALSER, Attorney General of North Carolina, in the name
of the People of the State of North Carolina, on the
relation of W. H. WILSON v. JOHN Y. JORDAN.

(Decided May 9, 1899).

*Statutes in Pari Materia—Unconstitutional Statutes—
Criminal Court Clerk's Office.*

1. All Acts of the same session of the Legislature upon the same
   subject matter are considered as one Act, and must be con-
   strued together, under the doctrine *of 'in pari materia'*. They
   should be considered *in pari materia*, whether passed at the
   same session or not.

2. Where a former Act has been repealed, or has expired by its limi-
   tation, when it is *in pari materia*, it must be considered in
   connection with the last Act, and if necessary, a part of it.

3. Where there are different Statutes *in pari materia*, though made
   at different times, or even where they have expired, and not
   referring to each other, they shall be taken and considered
   together as one system, and as explanatory of each other.

4. The Acts of 1899, viz.: The Act of 27th February, entitled "An
   Act to abolish the Criminal Circuit Court, composed of the
   Counties of Buncombe, Madison, Haywood, Henderson and
   McDowell;" The Act of 3rd March, entitled "An Act to estab-
   lish the Western District Criminal Court;" and the Act of 6th
   March, entitled, "An Act to abolish the Criminal Circuit com-
   posed of the Counties of Buncombe, Madison, Haywood, Hen-
   derson and McDowell"—must be considered together, and are
   *in pari materia* with the Act of 1895, chapter 75, entitled, "An
   Act to establish a Criminal Circuit Court, to be composed
   of the Counties of Buncombe, Madison, Haywood and Hender-
   son," and with the Act of 1897, chapter 6, amendatory of the
   Act of 1895—and being thus considered, the Acts of 1899 are
   but amendments to the Act of 1895 and the Act of 1897, and
   do not abolish the Criminal Court of Buncombe County.

5. Where a public office is not abolished by legislation, the public
   officer elected thereto has a property in the office, of which
   he may not be deprived by legislation. *Hoke v. Henderson,*
   15 N. C., 1.

CIVIL ACTION in the nature of a *quo warranto* to try the right to a public office, to-wit, the office of Clerk of the Western Criminal District Court for BUNCOMBE County, tried before *Starbuck, J.*, at March Term, 1899, of the Superior Court of Buncombe County, upon complaint and demurrer.

The complaint in substance alleges that, under the Act of 1895, chapter 75, entitled "An Act to establish a Criminal Circuit Court to be composed of the counties of Buncombe, Madison, Haywood and Henderson," the plaintiff, at the general election in November, 1896, was duly elected and qualified as Clerk of said Criminal Court for Buncombe County for four years, and entered upon his office on the first Monday in December, 1896, and that his term was not yet expired; that the defendant under color of an appointment by the Judge of the "Western Criminal District Court," had entered upon, usurped and illegally taken possession of his office, and ejected him therefrom, his Honor, the Judge making the appointment, claiming to act under the authority of several acts of the Legislature of 1899, viz., the Act of 27th of February, entitled "An Act to abolish the Criminal Circuit Court, composed of the counties of Buncombe, Madison, Haywood, Henderson and McDowell;" the Act of March 3d, entitled "An Act to establish the Western District Criminal Court;" and the Act of March 6th, entitled "An Act to abolish the Criminal Circuit, composed of the counties of Buncombe, Madison, Haywood, Henderson and McDowell;" that none of the acts, separately or combined, had the legal effect of abolishing the office which had been given to plaintiff by the people, and out of which he had been wrongfully ousted, and he asks to be re-instated.

The defendant demurred to the complaint, claiming the office of Clerk by the appointment of the judge under authority of the Acts of the session of 1899, cited in the complaint.

The Court sustained the demurrer, and rendered judgment dismissing the complaint.

The plaintiff excepted and appealed.

*Messrs. V. S. Lusk* and *Frank Carter,* for plaintiff (appellant).

*Messrs. Moore & Moore, Carter & Weaver* and *Shepherd & Busbee,* for defendant.

FURCHES, J., delivers the opinion of the Court.

CLARK, J., delivers dissenting opinion.

DOUGLAS, J., delivers concurring opinion.

FURCHES, J.   The Legislature of 1895, chapter 75, established Criminal Courts in Buncombe, Haywood, Henderson and Madison counties.   These courts only had criminal jurisdiction.   It was provided in that Act that these counties should compose a criminal circuit, and that there should be a judge elected, styled a Criminal Circuit Judge, who should preside over and hold these courts.

The Legislature of 1897 (Chapter 6) amended the Act of 1895 by giving these courts civil as well as criminal jurisdiction, and by changing the name to "Circuit" instead of "Criminal Circuit Courts."   And the same Legislature (Chapter 7), created a similar court in McDowell county, with the same jurisdiction of those of Buncombe, Henderson, Haywood and Madison, and placed it in the "Circuit" with those counties, and to be held by the same judge.   Under this legislation, these courts were organized, a judge and clerks elected by the people.   The plaintiff, being elected for the county of Buncombe, gave his bond and was inducted into office as Clerk for a term of four years, which has not expired; and the plaintiff is still entitled to this office, unless he has been removed therefrom by the legislation of 1899.

The Legislature of 1899, by an act passed on the 27th of February, enacts as follows: "Section 1.   That the Criminal Circuit Court, composed of the counties of Buncombe, Madison, Haywood, Henderson and McDowell be, and the same are hereby abolished;" and it provides that all the business pending in those courts be transferred to the Superior Courts of their respective counties.   That on the 3rd day of March, four days thereafter, the Legislature passed another act, entitled "An Act to establish the Western District Criminal Court."   This act is elaborately drawn, being almost a perfect copy of the Act of 1895, except as will be pointed out hereafter; and on the 6th day of March, three days after the passage of the Act to "establish the Western District Criminal Court," the Legislature passed another act, entitled, "An Act to abolish the Criminal Circuit composed of the counties of Buncombe, Madison, Haywood, Henderson and McDowell."

If the Act of the 27th of February, 1899, stood alone, we would hold that it "abolished" the Criminal Court of Buncombe County, though it does not say that it abolishes this court.   It says "that the Criminal Circuit Court," composed of the counties of Buncombe, Madison, Haywood, Henderson and McDowell, is abolished.   If no other act had been passed, re-establishing this Court, the intention of the Legislature would be manifest, and it would be our duty to hold that this Court was "abolished."   If the Criminal Court of Buncombe County has been abolished and not restored by this legislation, the clerkship being but an incident depending on the existence of the Court, it is also abolished and the plaintiff has no office, and no right to maintain this action.   If it is claimed that the Act of March 6th is the Act that abolished this Court, then the Act of March 3d was passed when plaintiff was in office, and the Act of March 3d legislated him out of it.

The Act of March 3d, as we have said, is almost an exact copy of the Act of the 23d of February, 1895, and, so far as the powers and jurisdiction and territorial extent of the courts, established by the two acts are concerned, they are the same.

The Act of 1899 differs from the Act of 1895 in these respects: It is extended to the Counties of Burke, Surry, Yancey, Forsyth and Caldwell. It provides that the Commissioners of the Counties, included in this Act, shall not draw less than twelve nor more than twenty-four jurors for the first week of the Superior Courts embraced in this Criminal Circuit. It provides a Solicitor to be appointed by the judge, for the most of the Counties embraced in the circuit. It provides that these solicitors, so appointed by the Judge of this Criminal Circuit, shall go into the Superior Courts and prosecute for the State. It increases the Judge's salary from $1,800 to $2,750; and, while it provides for the appointment of clerks, it fails to provide that he shall enter into bond for the discharge of his duties, and it fails to provide any fees for the clerk, except as may be provided in Section 13 of the Act, which is as follows: "That it shall be the duty of the Board of County Commissioners of each of said Counties to provide for the payment of fees of the Solicitor and the fees and compensation of the Clerks and the Sheriffs of said Counties respectively, and the pay of jurors and witnesses as is now provided by law, and all other expenses incident to said Court, by order on the County Treasurer of said respective Counties." And it only vests the Court with criminal jurisdiction, as did the Act of 1895, before the amendment of 1897. If there be other changes made to the Act of 1895 by the Act of 1899, they are of minor importance, or have escaped our attention.

All Acts of the same session of the Legislature upon the

same subject matter are considered as one Act, and must be construed together, under the doctrine of *"In pari materia."* *State v. Bell,* 25 N. C., 506; Black on Interpretation of Laws, Section 86; Endlich on Interpretation of Laws, Section 45; 20 Tex., 355. They should be considered in *pari materia,* whether passed at the same session or not. *Simonton v. Lanier,* 71 N. C., 478; *Rhodes v. Lewis,* 80 N. C., 136.

Where a former Act has been repealed or has expired by its limitation, when it is in *pari materia,* it must be considered in connection with the last Act, and, if necessary, a part of it. Potter's Dwarris, 190. "It certainly appears strange," said *Williams, J.,* in a late case, "that when an Act of Parliament is *per se* 'abolished,' it shall virtually have effect through another Act. But in that case the former Act was substantially reenacted. *Reg. v. Merionethshire,* 6 Adol. and Ellis, 343. It does indeed seem to be the prevailing doctrine (and it is more rational in itself than consistent with coeval maxims), that where one statute refers to another, which is repealed, the words of the former Act must still be considered as if introduced into the latter statute." Potter's Dwarris, p. 192.

In *Rex v. Laxdale,* 1 Burr., 445, it is held (Lord Mansfield delivering the judgment of the Court), "That where there are different statutes in *pari materia* though made at different times, or even where they have expired, and not referring to each other, they shall be taken and considered together as one system, and as explanatory of each other." The same doctrine is held in New York. *Smith v. People,* 47 N. Y., 330, which is very much in point.

It is now seen that the Acts of the 27th of February, the 3rd of March, and the 6th of March, 1899, were passed in rapid succession by the same session of the Legislature; that

the Act of March 3rd is in substance a reenactment of the
Act of 1895; that they are in *pari materia,* and must be
construed as one Act.    Thus considered, it becomes a mat-
ter of judicial construction as to the effect of this legislation
upon the office of Clerk of the Criminal Court of "Buncombe
County."    To enable us to do this, it becomes necessary to
consider the whole Act of March 3, 1899, in connection with
the other Acts, although some parts of them do not directly
bear upon the clerkship of Buncombe County, for the pur-
pose of properly understanding and construing them.

The third Section of the Act of March 3, 1899, provided:
"That the said Courts shall have exclusive original jurisdic-
tion to inquire of, hear and try all crimes, misdemeanors
and offences, committed in the Counties of Buncombe, etc."
This takes away from the Superior Courts all original juris-
diction in criminal cases, and it takes from Justices of the
Peace all criminal jurisdiction, as they have no appellate
jurisdiction—their jurisdiction being only original.    This
would seem to be in conflict with Article IV, Section 27, of
the Constitution, which expressly provides that, "Justices of
the Peace shall have jurisdiction of all criminal matters aris-
ing within their Counties, where the punishment can not
exceed a fine of fifty dollars or imprisonment for thirty
days."    This Section further provides "that in all criminal
matters, the party against whom judgment is given may
appeal to the Superior Court, where the matter shall be
heard anew."    It (the Act of 1899) further on, in the same
Section, provides that these Criminal Courts shall have
jurisdiction of all these crimes and offences "fully and to
the same extent as the Superior Courts of the State."    But
this does not seem to limit their exclusive jurisdiction, but
to declare the extent of their power, their jurisdiction, to try
and dispose of these matters.    Whether this Act taking from

124—44

the Superior Court its criminal jurisdiction as provided by
Section 12, Article IV, of the Constitution, is in conflict
with the Constitution, it is not necessary for us to decide in
this case, and we simply refer to *Rhyne v. Lipscombe,* 122
N. C., 650, and Cooley Const. Law (6 Ed.), 156. The
question of apparent conflict with the Constitution is more
directly presented in the 18th Section of the Act which pro-
vides that the County Commissioners shall draw not less
than twelve nor more than 24 jurors for each week of the
Superior Court. We had a jury system here before, and
at the time of the adoption of all our Constitutions—a grand
jury of 18, and petit jury of 12. Our Constitution and
judicial system must have recognized this policy—this law
of the organization of our Superior Courts. *Rhyne v. Lips-
combe and Cooley, supra.* Superior Courts are established
by the Constitution and can not be abolished by the Legisla-
ture. Nor can the Legislature deprive them of their right-
ful jurisdiction. The Legislature may give other Courts a
part of the jurisdiction of the Superior Courts, but it can
not deprive them of their constitutional jurisdiction. Here
are nine Counties where the Commissioners may refuse to
draw more than 12 jurors. It would be impossible for the
Court to draw a grand jury of 18 out of a panel of 12 jurors.
But it is said we have provided a Criminal Court for these
Counties, to try criminal offences. That is so. But we
are discussing the constitutional question—the right of the
Legislature to dismantle and disable the Superior Courts.
If the Legislature has the right to do this in these nine Coun-
ties, it has the right to do so in any other nine Counties, or
in all the other Counties in the State. And the fact that
they have established a Criminal Court in these Counties
does not affect the question of their constitutional power to
destroy the criminal jurisdiction and usefulness of the

Superior Courts. If the Legislature has the power to do this in Counties where it has established Criminal Courts, it has the *power* to do so in Counties where there are *no Criminal Courts*. It would seem that it might divide the jurisdiction between the Superior Courts and Inferior Courts, but it can not destroy the constitutional jurisdiction of the Superior Courts.

But Section 5, of the Act of 1899, provides that the Solicitors of these Criminal Courts, appointed by the Judge of these Criminal Courts, shall prosecute for the State in the *Superior* Courts, and receive the fees, in case of conviction, that the Solicitors of the Superior Courts are . entitled to. This would seem to be in direct conflict with Section 23, Article IV. of the Constitution, which provides that "A Solicitor shall be elected for each Judicial District by the qualified voters thereof, as is provided for members of the General Assembly, who shall hold office for the term of four years, and *prosecute on behalf of the State in all criminal actions* in the *Superior Courts.*"

These provisions of the Act—some of them so plainly in conflict with the Constitution—and the imperfections of the Act in failing to provide for any fees for the Clerk, and in failing to provide that he should give bond, are referred to for the purpose of showing that, as an independent Act, it would be incomplete and imperfect legislation. But to treat the three Acts together, in *pari materia,* as it seems to us they must be treated under the authorities we have cited, they then become but amendments to the Act of 1895. There are no clauses in these Acts but what could be, and would be, by all the rules of interpretation, treated as amendments to the Act of 1895, except that which declares that the Court is abolished. This does not make it so, if it is not so. Treating them as amendments does not cure any violations of the Constitution.

It was declared in the Act of 1895, with regard to the Insane Asylum, that the Board of Directors was abolished, and this Court held that it was not. *Wood v. Bellamy,* 120 N. C., 212. The Act of 1899, with regard to the Penitentiary, declared the office of Superintendent abolished, and this Court held that it was not. *State Prison v. Day,* at this term. It is shown by the authorities cited, and quoted above, that these opinions are in line with the text writers, and with English and American adjudications. Taking out of these Acts the sentence that the "Court is hereby abolished," and everything else would be properly construed as amendatory. Although these Courts were put into a "Criminal Circuit" by the Act of 1895, and into a "Circuit Criminal" by the Act of 1899, that makes no difference. The Court of each County embraced in the "Circuit" is a separate and independent Court—the Court in one County in no way depending upon the Court in another County. The fact that the Circuit was enlarged and more Counties included in it, makes no difference. The Court in Buncombe County is just the same as it was before other Counties were included. The Act of 1897 put McDowell County in that Circuit, but this did not abolish or change the Criminal Court of Buncombe County. The Superior Courts of one County have frequently been taken out of one Judicial District and put in another, and Judicial Districts have been changed so as to include more Counties; and this did not abolish the Court or change the powers or jurisdiction of the Court. The fact that the Act of 1899 did not undertake to establish civil jurisdiction, attempted to be given by the amendatory Act of 1897, nor the fact that it provides for appeals to the Superior Courts instead of the Supreme Court, makes no difference, as these amendments had been declared to be unconstitutional and void. *Rhyne v. Lipscombe,*

*supra.* If it was desirous to make these changes they were the proper subjects of amendment.

It is claimed that the Court should look for the object to be attained by the enactment—what was the wrong and what was the intended benefit to be effected by the legislation. But when we apply this rule, and look for the evil under the Act of 1895, and the benefit to be accomplished under the Act of 1899, we find none, as the Court under the Act of 1895 and under the Act of 1899 is precisely the same, except as to the personnel of the Clerk. The plaintiff is out and the defendant is in. We can find no reason for this change, unless we were to enter a field of inquiry that we, as a coordinate department of the Government, have no right to enter, and which we have no more disposition to enter than we have the right to do so. That field of inquiry to us is a "sealed book."

So, finding that according to the precedents, judicial interpretation, the fact that the Act says that it is "abolished" does not make it so, if the Act itself shows that it is not, we proceed with our investigation. And in doing so, we find the Act of the 3rd of March, referring to and recognizing the Criminal Courts established by the Act of 1895, the Act that defendant claims to have been "abolished" by the Act of the 27th of February, which provides in Section 22 as follows: "That all criminal causes, indictments and proceedings by *scire facias* or otherwise against defendants or witnesses and their sureties, now pending in the Circuit Courts of the Counties of Buncombe, Madison, Haywood, Henderson, McDowell or the Superior Courts of any of the Counties composing said Western Criminal Court, shall be and are hereby transferred and removed to the Western Criminal District Court created by this Act."

Thus it is seen that this Act recognizes the existence of

the Criminal Courts established by the Act of 1895, by providing that all the cases *now pending* in said Courts shall be, and are *"hereby"* transferred, that is by the Act of the 3rd of March, 1899, to the Courts created by that Act.

This Court being purely a creature of legislation has no functions or powers except those given it by the Legislature. It has no Clerk except as given it by legislation. It has no Judge or other officer except as given it by legislation. Its officers have no fees except as prescribed and fixed by legislation. None of its officers, witnesss or jurors, except the Judge and Solicitor, have their fees and compensation fixed by the Act of 1899, without referring to the Act of 1895. The Act of 1895 prescribed and fixed all these fees and compensation. The Act of March 3rd provides that they shall be the same as *now fixed by law*. The Act of 1895 is the only *law* fixing the fees of the officers of this Court, and must be the law referred to in the Act of 1899.

We are thus led to the conclusion that the Acts of 1899 must be considered together, and are in *pari materia* with the Act of 1895 and Act of 1897, creating a Criminal Court in McDowell County, and putting it in the Criminal Circuit with Buncombe and other Counties. Thus considered, they are but amendments to the Act of 1895 and the Act of 1897, and do not abolish the Criminal Court of Buncombe County. And this being so, the relator, Wilson, is entitled to his office under the doctrine of *Hoke v. Henderson,* 15 N. C., 1 ; *Wood v. Bellamy* and *State Prison v. Day, supra, and* every other case decided by this Court since *Hoke v. Henderson,* where the question has been involved. This case has been the pride of the bench and of the bar of this State for more than 60 years; and whatever others may say, we find it to be the settled law of this State, based as we believe upon just principles and sound reasoning.

We have recently heard the argument advanced that a public officer has no interest in the office, but only in the salary and fees of the office. This is new doctrine to us. The salary and fees are but incidents of the office, and if one has no office he has no interest in the fees. Take the office from its owner, and you take from him the fees. *Hoke v. Henderson* recognizes this right, this property in an officer, and protects it as the property of the owner. But we do not feel called upon at this late day to defend *Hoke v. Henderson*. It has been defended by every decision of this Court from 1833 to the present time.

From the intimations made by a member of this Court we are induced to say: that we have discussed the legal questions arising in this case as they appeared to us; we do invite criticism, we have no right to object to fair criticism, and we do not do so. If such criticism shall be indulged in, as is not just or legitimate, we believe that an intelligent and learned profession will discriminate between that which is legitimate and that which is not.

It has been suggested by a member of this Court, that the Legislature has the power to impeach a Judge—that it has recently done so, and that there is no appeal from its judgment. Such a suggestion as this, has never occurred in the history of this Court until now. This suggestion added nothing to the strength of the argument advanced for the defendant. Why it should have been made, we do not know. But remembering our position as members of this Court, we will not express our sentiments as to such suggestions, and will only say that, in our opinion, any member of any Court, who would allow himself to be influenced by such suggestions is unfit to be a judge.

WILSON v. JORDAN.

There is error and the demurrer should have been over-ruled. The plaintiff is entitled to the relief he demands. Error.

CLARK, J., dissenting. By Chapter 75, Laws 1895, the Legislature established "The Criminal Circuit Court of Bun-come, Madison, Haywood and Henderson Counties," said Act providing among other things "There shall be a Clerk for the said Criminal Court for Buncombe County," to be elected by the voters of said County, and to hold for a term of four years. The relator was elected under said pro-vision at the general election in November, 1896, and was inducted into office on the first Monday in December of that year. By Chapters 6 and 7, Laws 1897, the above cited Act was amended by adding McDowell County to those com-posing the circuit, conferring civil jurisdiction concurrent with the Judges of the Superior Court in those counties and changing the title of the Court to the "Circuit Court of Bun-combe, Madison, Haywood; Henderson and McDowell Coun-ties."

The General Assembly, by an Act ratified February 27, 1899, and to take effect from its ratification, abolished the "Criminal Circuit Court, composed of the Counties of Bun-combe, Madison, Haywood, Henderson and McDowell," and directed therein that all criminal causes pending in said Criminal Circuit Court should be transferred to the Superior Court for their respective Counties, and the Clerks of said Courts should immediately turn over to the Clerks of the Superior Courts in their respective Counties all records belonging to their respective offices, and that all crimes here-tofore punishable before said Criminal Courts should be cog-nizable only before the Superior Courts of the several Coun-ties. As the Legislature had unquestioned power to abolish said Court and the offices appurtenant, and as we can gather

the legislative intention only from the Act itself, this would seem a very clear abolition. Henceforward the Criminal Circuit Court of the five Counties was only a memory,

> " Like the lost Pleiad.  ·
> Seen no more on earth below."

While the exact title of the abolished Court was not very accurately recited, it was sufficiently so, for the description left no doubt as to what Court was abolished, and the Act repealed "all laws and clauses of laws contrary to this Act." But out of abundant caution the General Assembly passed another Act, ratified March 6, 1899, to abolish the Criminal Court, reciting therein that the above recited Acts establishing the Court and amendatory thereto, to-wit, Chapter 75, Laws 1895, and Chapters 6 and 7, Laws 1897, were repealed. This having been already most effectually done by the Act of February 27, the duplicating Act of the 6th of March, was simply of no effect, most certainly it can not be construed as again reviving and putting in life the Court which had been abolished on the 27th of February, for the momentary purpose of again killing it.

On March 3, the Legislature not having increased the number of Superior Court Districts as had been proposed, evidently came to the conclusion (judging its motives by its enactments, the only course permissible to us) that the Superior Courts of many Counties had been overloaded, and proceeded to create an entirely new court. "The Western Criminal District Court," and placed in it the following Counties: Buncombe, Haywood, Burke, Surry, Yancey, McDowell, Henderson, Caldwell, Madison and Forsyth— double the number of Counties and covering more than double the territory of the Court which had been abolished February 27. This was held in the very recent case of *Ward v. Elizabeth City,* 121 N. C., 1, to be sufficient to destroy the identity of the two Courts, it being there said

"the plaintiff, who was city attorney under an abolished cor-
poration has no claim to the salary of city attorney in a
substantially different corporation created by the General
Assembly, though it embraces the whole of the territory and
population contained in the former corporation, much more
being added to the new corporation." Why should this
Court be called upon to overrule this most recent and unani-
mous decision in order to defeat the legislative will as
expressed in the Act of February 27. But in many other
respects besides the vastly increased territory (now reach-
ing down towards the center of the State), and the difference
in its name, the Court created on the 3rd of March, differs
materially from that which was destroyed on February
27, among these other differences are: The Acts creating the
abolished circuit for five Counties purported to confer both
civil and criminal jurisdiction and appeals were to lie direct
to the Supreme Court, while in the new District Court, com-
posed of ten Counties, only criminal jurisdiction is con-
ferred, and appeals lie to the Superior Courts instead of to
this Court. It is true this particular modification was doubt-
less due to decisions of this Court rendered in regard to the
jurisdiction of Criminal Courts, but none the less it is a
change from the provisions creating the former Court.
Then the Clerks and Solicitors in the Court abolished on the
27th of February were elected by the people of the respective
Counties; in the new Court they are appointed by the Judge.
Under the old Court there was one Solicitor for the entire
district; under the new, there is a solicitor for each County,
with many new duties, and different from those prescribed
for the Solicitor under the old court. There are many other
differences between the Courts showing that the Legislature,
when it created the new Court on the 3rd of March, did not
intend to resurrect and recreate the old Court it had

abolished on the 27th of February, an intention which was further negatived by the second abolition Act of March 6th, duplicating and reiterating the abolition of the old Court, yet it is only upon the ground that the new Court was *intended by the Legislature* to recreate and continue in force the old Court, that the Court can hold that the old Court was not abolished by the Act of February 27. In *Wood v. Bellamy,* 120 N. C., 212, the Court arrived at this intention from the fact that the abolishing Act and the recreating Act were one and the same, and that on its face it purported to be, and in fact was, merely amendatory of the original Act creating the Insane Asylum, and because there was no substantial change, at the most the titles of a few offices being altered, the Court saying (p. 222), "There is nothing in the Act but the same old offices, with changed names, with the same duties, rights and privileges, as were provided under the old law." But it is absolutely impossible to read the Act of March 3rd and find therein or draw therefrom any legislative intention to resurrect and keep in force a different Court embracing less than half the territory, with different jurisdiction, with officers selected in a different mode and with many other differences, which had been unequivocally abolished on the 27th of February.

There can be no question of the meaning of the Act of the 3rd of March creating the new Court, but it is suggested that a different meaning can be read into it by reading it in connection with the Act of February 27, as in *parti materia,* on the ground that all Acts passed at the same session of the General Assembly are in effect one and to be construed together. If so, the subject matter is changed with the delightful frequency to be found elsewhere only in a dictionary. But the old fiction that all Acts are parts of one and the same enactment, like The Code for instance, is

utterly untrue in fact, and is contradicted by the modern cus-
tom of making each Act take effect from the date of its rat-
ification.

The Act of February 27, abolishing the old Court, was
within the power of the General Assembly to enact, and the
Courts can only declare it nullified and set it aside when in
conflict with some provision in the Constitution; it can not
be done by virtue of a fiction created merely by judicial con-
struction in the remote past when Parliament sat often not
more than a day or two at a session—a fiction too which has
· long since been exploded.

But it is further contended that the two Acts being in
*pari materia* must be construed together.    That is "begging
the question" at issue.    It is contended that the two Acts, if
they could be construed together, would be in *pari materia*
and therefore, being in *pari materia,* ought to be construed
together.    They were both passed at the same session and
they are both in regard to Courts, but that does not make
them in *pari materia*.    A reading of them shows that they
are anything else than in *pari materia*.    One Act is abolish-
ing a Court for five Counties having criminal and civil juris-
diction; the other is an Act passed on a different day creat-
ing a Court for ten Counties, restricted to criminal juris-
diction and with many other features, some of which are
above recited, distinguishing it from the Court which was
abolished on the 27th of February. When two or more Acts
are in *pari materia,* the Court will contrue them together
solely for the purpose of· ascertaining the legislative intent,
but it will never assume that the Acts are in *pari materia,*
when they are totally different, for the purpose of constru-
ing them together, and hold that because construed together
the clearly expressed and unmistakable intent of one Act is
negatived and set aside by the other.

The closing words of the speech of the learned counsel of the plaintiff in his argument to this Court (and which is, though less distinctly, set out in his brief) summed up and stated in a compact form the true ground on which he relied to bracket together the Act of February 27, and that of March 3, in the hope to get a judicial decree annulling and setting aside the Act of February 27, which abolished the Court, and with it, the office of his client. Said he in substance and nearly in *totidem verbis,* "When the Legislature on February 27 abolished the old Court it was lusting for the offices it furnished, and at that time the Legislature intended to creat this new Court, and this Court should construe the two Acts together and set aside the Act of February 27, and defeat the fraud thus intentionally perpetrated upon my client." The argument was frank and stated the only ground upon which the Act of 27th of February can be nullified, or construed to mean a continuance of the plaintiff's office when it decreed just the opposite—its immediate and utter abolition. If the Courts have jurisdiction of the Acts of the Legislature, can divine and declare its motives, and set aside an Act of that greatest of the departments of the Government just as it can pass upon the *bona fides* of a deed between individuals, and set it aside for fraud, then the plaintiff might have ground to maintain this action provided he had introduced evidence to sustain the charge of *mala fides,* and a jury had sustained his contention, neither of which has been done in this case, and no Court in an English speaking community has deemed itself vested with such jurisdiction.

A frequent recurrence to first principles is essential to the maintenance of liberty. The Legislature is the great and chief department of Government. It alone is created to express the will of the people. As said in a recent opinion

by FAIRCLOTH, C. J., *Ewart v. Jones,* 116 N. C., 570: The sovereign power is exercised by the General Assembly, "the only limitation upon this power is found in the organic law as declared by the delegates of the people in Convention assembled from time to time." Whereas the two coordinate departments—the judiciary and the executive—have no powers whatever except those granted by the Constitution or by the Legislature, and the last can be resumed or withdrawn at the legislative will. The Legislature has all the power the people themselves have, except where restricted by the Constitution; the Executive and Judiciary have none except what is given by the Constitution. The Supreme power in every government of every kind is the law making power, wherever it may be vested. With us that power is vested in the people, who exercise it through their representatives in Congress and in the several State Legislatures, subject to review by the people themselves at the next election, when they may choose new representatives who can repeal what has been done. In no other country than in the United States, not even in those with written Constitutions, has any Court claimed or exercised the power to declare an Act of the Legislature invalid because in conflict with the Constitution, and in this country it is conferred upon no Court by any constitutional provision. It has been assumed by the Courts upon their own motion, and though it has been more or less exercised for over one hundred years no State has ever yet recognized it by inserting a provision in its Constitution empowering the Court to declare any Act of the Legislature unconstitutional. Eminent statesmen and jurists have denied the power and asserted that neither the Executive nor the Legislature is bound by such decrees of Courts, which they have no constitutional warrant to authorize. In truth this assertion of authority by the Courts to

annul an Act of the Legislature upon the ground that the Court thinks it in conflict with the Constitution has been tolerated rather than conceded, upon the reiterated declarations of Courts that they would never hold any Act unconstitutional unless it was plainly and beyond reasonable doubt in violation of the Constitution. Notwithstanding this toleration in the exercise by the Courts of this power thus limited, when recently the sudden change of opinion by one Judge, set aside a great public measure which had been passed by the two houses of Congress and approved by the President, and thus transferred over $60,000,000 of annual taxes (of which North Carolina's share is one and a half million) from those most able to bear it, the receivers of large incomes, and placed it upon those least able to bear it, the laboring masses, the nation awoke to the immense liability to abuse of this irresponsible power assumed by the Judiciary, without any express constitutional warrant, to nullify and set at naught the will of the people as expressed through their constitutional organs, their Legislatures and Congress. This is not an auspicious time for the Courts to "amplify their jurisdiction" in that direction. North Carolina is one of the States that has never given its Executive even a modified veto upon legislative action, and there is nothing in its Constitution indicating any intention to give the judiciary any supervision or control over the lawmaking power. On the contrary, while the Courts can not pass, in any the most remote degree upon the title to his seat of any member of the Legislature, that body can sit in judgment upon any member of the Executive or Judiciary branches of the State Government by impeachment, and remove him from office. This indicates that the ultimate supervisory power is in the Legislature, not in the judicial department.

The Legislature is the great depository of power subject to

review by the people themselves at the next election, as the real sovereign. It only has the power, which belongs to the sovereign alone, of levying taxes, of granting and withholding supplies, by which power governments are stopped or put in motion—the power which alone subordinates the military to the civil authority and prevents usurpation from any quarter.

I would not be understood as contending that the power which the Courts have so long exercised (often for good, sometimes not) by declaring legislative Acts unconstitutional, is invalid. But it is well to recall that it is not derived from any provision in the Constitution, that during all this time popular sentiment has not yet so far endorsed it as to guarantee it by a constitutional amendment, that it is not inherent in, nor necessary to, the Courts as none outside of the United States exercise it, and that being thus without constitutional warrant every extension jeopardizes its extinction. The independence of the Judiciary does not require that it shall have the power to intervene in a coordinate department and set aside its actions as invalid. When this is done, it is upon other grounds than the independence of the Judiciary.

Prior to the Revolution, the only branch of the Government in North Carolina in which the people had a voice was the legislative. The Executive and Judiciary were appointed by the Crown and were oppressive and obnoxious. As a consequence, when the Convention at Halifax in 1776 framed our first State Constitution, the Government was made almost entirely legislative. The Governor and all the State officers were elected by the Legislature, the Governor and Treasurer for terms of one year, and the Judges were elected in the same mode for life. This remained unaltered for nearly 60 years when the Convention of 1835 amended the Constitution by making the Governor elective by the peo-

ple for a term of two years.    The present Supreme Court
was created by legislative enactment in 1818, and while the
Judges held for life, their offices were subject to be abolished
at any time by legislative enactment.

In 1868 the Governor and Chief Executive officers, Secre-
tary of State, Treasurer, etc., were made elective by the peo-
ple for terms of four years, and the Supreme Court was
made a coordinate department of the Government.    The
judges of the Supreme and of the Superior Courts were
made elective by the people for terms of eight years, but all
other Courts remained, as before, to be created or abolished
at the will of the Legislature, who could also regulate the
exercise of their powers by all Courts below the Supreme
Court (Constitution, Article IV, Section 12), and power is
expressly reserved to the Legislature to abolish any of the
Superior Court judgeships.    Constitution Article IV, Sec-
tion 10.    The independence of the Supreme Court only
(and not of the entire judicial department) is provided for.
Article I, Section 8.    From this it will be seen that, while
the Supreme Court is made independent of the Legislature,
instead of being a legislative creation, as theretofore, there
is nothing which looks to giving the Supreme Court super-
visory control over the Legislature which voices the will of
the sovereign, subject to a referendum every two years of
their conduct in the election of a new General Assembly who
can pass upon and repeal any Act whatever of their prede-
cessors, and no power is given the Courts to interfere with
this review and rejection by the popular vote of the action of
their agents in a former General Assembly.    Whatever pow-
ers are given the judiciary and executive are grants set out in
the Constitution.    On the other hand, the Legislature are
the agents of the people, speaking their will, and only
restricted where the Constitution has limited their powers,

124—45

and their actions are subject always to review at the ballot box. This is our Government. In it there is no room for a judicial hegemony. The sovereignty remains always in the people to be exercised readily and promptly. It can not be tied up and put beyond their reach by a 60 days' Legislature creating officers for four years or 50 years or for life, and putting them in charge of the State institutions and the State's property. The emoluments of such office holders can not be more sacred than the right of the people to control their own Government, and to change the management of their own property whenever they think proper.

In the present case, the General Assembly had the undenied power to pass the Act of the 27th of February, abolishing the Criminal Circuit and with it the plaintiff's office. Beyond all controversy this was done by that Act. If the Act of the 3rd of March, creating the new Court is defective in any way, it does not concern the plaintiff, but the incumbents of office under the new Court. There is nothing in the Act of March 3 which refers in the slightest degree to the Act of February 27, or which by any reasonable construction can be held as indicating a legislative intention to repeal the clear expressions of that Act. The only logical ground is that expressed by the counsel for the plaintiff, that the Act of February 27 was passed with the intention to reenact the Court on March 3, with some insubstantial variation, and therefore the Act of February 27 should be set aside as a fraud perpetrated upon his client. It is only by that process that the Acts of February 27 and March 3 can be put together and construed in *pari materia,* for there is nothing in the face of the Acts to indicate that the Legislature intended they should be construed together. That position has not in any respect been endorsed by this Court, and unless it was, it is clear to my mind that the Act of

February 27, abolishing the plaintiff's office is still in full force, and that his Honor, *Judge Starbuck,* was correct in sustaining the demurrer to the plaintiff's complaint upon that ground.

DOUGLAS, J., concurring. In view of the number of important cases involving the title of office which we have been called upon to decide under the principles laid down in the celebrated case of *Hoke v. Henderson,* (15 N. C., 1), I deem it proper to define my position in a concurrent opinion where I have greater latitude of expression than I would feel justified in using as the mouth piece of the Court. I believe it is the unquestioned right of a Judge to express, in a fair and respectful manner, his dissent or concurrence upon every question that may come before the Court of which he is a member, and this right I shall not hesitate to exercise within the limitations of my judgment and my conscience. This is equally the right of others, to whom I shall always cheerfully concede the same absolute integrity of motive and conduct that I claim for myself. In fact, I always prefer to give expression to my individual views in a separate opinion rather than inject them into an opinion of the Court where they are unnecessary for its determination, and thus force my brethren, who freely concur in the result, into an apparent concurrence in *dicta* that may not fully meet their approval. There is also danger that such *dicta* appearing in the opinion of the Court may subsequently be mistaken for the decision of the Court. Two years ago when I came upon this Bench, its only new member, and in every way its junior, I was at once confronted with the class of cases represented by *Wood v. Bellamy.* After the most careful consideration, and certainly with no possible personal bias, I concurred with a *unanimous* Court in the decision of those cases, thus giv-

ing to the great principles enunciated in *Hoke v. Henderson* the deliberate assent of my judgment and my conscience. This assent I see no reason now to withdraw. If it was the law then, it is the law now; and those who now invoke those identical principles are entitled to their equal protection.

Fearing, however, that under the circumstances I might have been too much influenced by the *unanimous* opinion of my brethren of the Court, I have again carefully read *Hoke v. Henderson* and considered the principles therein involved. I can truly say that I can recall no abler opinion of any Court, nor could there be a nobler monument to the memory of the great Chief Justice who still retains the admiration of our profession and the grateful veneration of our people. That opinion was delivered at the December Term, 1833, of this Court by Chief Justice Ruffin, and concurred in by his associates, Judges Daniel and Gaston. This great Court sat together unchanged for more than ten years, and has had no superior here or elsewhere, either in the ability and integrity of judicial conduct or the purity of private life. Their honored portraits hang above our Bench, and the impression of their features upon that canvas is no clearer than the indellible impress of their characters upon the jurisprudence of our State. I deeply regret the suggestion that in this celebrated case their judgment was influenced by a desire to protect themselves from being legislated out of office by a hostile Legislature; in other words, that their most noted opinion was not the honest result of sincere conviction, but the illegitimate offspring of moral cowardice.

Even if they had not been protected by Constitution safeguards, such a suggestion, appearing neither in the record nor in the argument of counsel, would be equally unjust to them and to any Legislature that could ever receive the suffrages of our people.

I do not wish to seem invidious by selecting one with whose memory I have so many personal associations, but the rounded character of Gaston was admittedly the *beau ideal* of a North Carolinian. It may well be said of him that among the great men of his generation, few have left a more splendid and none a more stainless name. It is the deliberate judgment of his countrymen that throughout a long and distinguished life, he ever bore the trenchment blade of heroic manhood with the spotless shield of Christian chivalry. As far as I am aware, that opinion has never before been questioned, but on the contrary has been repeatedly cited and approved, affirmed and reaffirmed, until its very name has become the embodiment of a vital principle. I find it cited with approval upon one point or another in the following cases:

*Houston v. Bogle,* 32 N. C., 496; *State v. Moss,* 47 N. C., 66; *Thompson v. Floyd,* 47 N. C., 313; *State v. Glenn,* 52 N. C., 321, 327; *Cotton v. Ellis,* 52 N. C., 545; *Barnes v. Barnes,* 53 N. C., 366; *Galloway v. Railroad,* 63 N. C., 147; *State v. Smith,* 65 N. C., 369; *King v. Hunter,* 65 N. C., 603; *Clark v. Stanley,* 66 N. C., 59; *Brown v. Turner,* 70 N. C., 93; *Bunting v. Gales,* 77 N. C., 382; *Vann v. Pipkin,* 77 N. C., 408; *Prairie v. Worth,* 78 N. C., 169; *Lyon v. Aikin,* 78 N. C., 258; *McNamee v. Alexander,* 109 N. C., 246; *State v. Cutshall,* 110 N. C., 545; *Board of Education r. Kenan,* 112 N. C., 568; *State v. Womble,* 112 N. C., 867; *Trotter v. Mitchell,* 115 N. C., 193; *McDonald v. Morrow,* 119 N. C., 676; *Wood v. Bellamy,* 120 N. C., 216; *Ward v. Elizabeth City,* 121 N. C., 3; *Caldwell v. Wilson,* 121 N. C., 468; *Miller v. Alexander,* 122 N. C., 721.

In the above list I have included those cases directly citing it by name, omitting those merely tending to sustain it.

In *Ward v. Elizabeth City, supra,* on page 3, Mr. Justice

CLARK, in delivering the opinion of the Court, says: "The only restriction upon the legislative power is that after the officer has accepted office upon the terms specified in the Act creating the office, this being a contract between him and the State, the Legislature can not turn him out by an act purporting to abolish the office but which in effect continues the same office in existence. This is on the ground that an office is a contract between the officer and the State, as was held in *Hoke v. Henderson,* 15 N. C., 1, and has ever since been followed in North Carolina down to and including *Wood v. Bellamy, supra,* though this State is the only one of the 45 States of the Union which sustains that doctrine." In reviewing the list of the Judges who wrote the above opinions, or concurred therein, we find the names of every Chief Justice who has since presided over this Court, and of all the Associate Justices, with one or two exceptions before whom the question does not appear to have been distinctly raised. None appear ever to have questioned it.

Had I felt it my duty to have dissented two years ago from an otherwise *unanimous* Court, I would have done so; but I would have felt awfully lonesome.

An examination of the constitutional history of the State I think will clearly show that the principles so clearly enunciated in *Hoke v. Henderson* have not only received the practically unanimous approval of succeeding Judges, but have by direct implication been repeatedly ratified by the people themselves.

The following are usually regarded as the fundamental constitutions of North Carolina taken in their chronological order: Charter of Queen Elizabeth to Sir Walter Raleigh, (or Ralegh, as she persists in spelling his name) dated March 25, 1584; "Charter of Carolina," dated March 24, 1663, given by Charles II to the Duke of Albemarle, Lord

Craven, Lord Berkley, Lord Ashley, Sir George Carteret, Sir William Berkley and Sir John Calleton; the "Charter of Carolina," dated June 30, 1665, and given by Charles II to the same parties with the addition of the Earl of Clarendon; and "The Fundamental Constitutions of Carolina," dated March 1, 1669, and framed for the Lords Proprietors by John Locke and amended by the Earl of Shaftesburg; to which may be added the grant of 1630 to Sir Robert Heath, of the nature of which I know nothing. The Mecklenburg Resolutions of May 20, 1775, may also be considered as somewhat constitutional, as they clearly enunciate fundamental principles, although I am not prepared to say to what extent, if any, they were ever binding or operative.

This brings us down to the first "Constitution of North Carolina," which was framed by a "Congress" elected and chosen for that particular purpose, which assembled at Halifax on the 12th day of November, 1776. This Constitution was not submitted to the people for ratification, but appears to have met with general acceptance and to have remained unchanged until the amendments of 1835. It was this Constitution whose provisions were construed in *Hoke v. Henderson.* I have endeavored to make a synopsis of the opinion, but I find that no synopsis of which I am capable would do it justice; and so I will give only one or two extracts taken *verbatim.* The original headnote is as follows: "A Clerk appointed under the Act of 1806, has an estate in his office, and although the Legislature may destroy the office and by consequence the estate in it, yet the Act of 1832, which continues the office, but transfers the estate in it to another, is unconstitutional and void." Fuller notes appear in Tourgee's and Womack's digests. The following extracts appear to give the keynote of the opinion: "In the act under consideration, as far as it concerns the controversy between these

parties, there is no ambiguity; the words are plain, the intention unequivocal, and the true exposition infallibly certain. We can not, under the pretense of interpretation, repeal it, and thus usurp a power never confided to us, which we can not usefully exercise, and which we do not desire. Since the meaning of the Act can not be doubted, and according to that meaning Mr. Henderson had not, but Mr. Hoke had the right to the office of Clerk at the time the Judge refused to admit the latter, the ground of decision of the Superior Court, as stated in the record, recurs before this Court, and must now unavoidably be examined.

The Act transfers the office of Clerk from one of these parties to the other, without any default of the former, or any judicial sentence of removal. The question is, whether this legislative intention, as ascertained, is valid and efficacious, as being within the powers of the Legislature in the Constitutions of the country; or is null, as being contrary to and inconsistent with the provisions of those instruments. *To the determination of this question, the judicial function is competent.* It involves no collateral considerations of abstract justice or political expediency. It depends upon the comparison of the intentions and will of the people as expressed in the Constitution, as the fundamental law, unalterable except by the people themselves, with the intentions and will of the *agents* chosen under that instrument, to whom is confided the exercise of the powers therein delegated or not prohibited. Such agents are all public servants in this State, and the agency is necessarily subordinate to the superior authority of the Constitution, which emanated directly from the whole people. Legislative representatives may order and enact what to them may seem meet and useful, upon all subjects and in all methods, except those on which their action is restrained by the Constitution; and such order and enactment is obligatory alike on all citizens,

including those who are by a public duty to execute the laws, as well as those on whom they are to be executed. Courts therefore must enforce such enactments; for they are laws to them by the mere force of the legislative will. But when the representatives pass an act upon a subject upon which the people have said in the Constitution, they shall not legislate at all; or when upon a subject on which they are allowed to legislate, they enact that to be law which the same instrument says shall not be law, then it becomes the province of those who are to expound and enforce the laws, to determine which will, thus declared, is the law. Neither the reasons which determined the will of the people on the one hand, nor the will of the representatives on the other, can be permitted to influence the mind of the Judge upon the question, when reduced to that simple point. His task is the humbler and easier one of instituting a naked comparison between what the *representatives* of the people *have* done, with what the people themselves have said they *might* do, or *should not* do; and if upon that comparison it be found that the act is without warrant in the Constitution, and is inconsistent with the will of the people as there declared, *the Court can not execute the act,* but must obey the superior law, *given by the people alike to their judicial and to their legislative agent.*      *      *      *      *      *      *      *      *      *

But even these sanctions are not sufficient to overturn the Constitution, if the repugnance do really exist and is plain. For although the imputation is altogether inadmissable, that the Legislature intend wilfully to violate the Constitution, and still less that the people themselves contemplate violence to the instrument consecrated by their own voices and the consent of our ancestors; yet all men are fallible, and in the despatch of business, the heat of controversy, and the wish to effect a particular end, may inadvertently omit to scrutinize their powers, and adopt means, adequate indeed to the

end, but beyond those powers. It ought not to surprise that such an event should some times happen. * * * *
When unfortunately such instances do occur, the *preservation of the integrity of the Constitution is confided by the people, as a sacred deposit, to the Judiciary.* In the discharge of that duty, the *approbation of the Legislature itself is to be anticipated;* for the principle of virtue which restrains them from a known and wilful violation of it, will induce them to rejoice at the rescue of the Constitution from their own incautious and involuntary infraction of it. * *
In other words, *public liberty requires that private property should be protected even from the Government itself.* They people of all countries who have enjoyed the semblance of freedom, have regarded this and insisted on it as a fundamental principle. Long before the formation of our present Constitution it was asserted by our ancestors on various occasions; and, in one sense, *its vindication produced the revolution.* At the beginning of that struggle, while the jealousy of power was strong, and the love of liberty and of right was ardent, and the weakness of the individual citizen against the claims of unrestricted power in the Government was consciously felt, the people formed the Constitution of this State; and therein declared "that no freeman ought to be taken, imprisoned or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner destroyed, or *deprived* of his life, liberty or property, but by the law of the land? (Bill of Rights, s. 10.) By the fourth Section it is declared, "that the legislative, executive and supreme judicial powers of Government ought to be forever separate, and distinct from each other."

"In absolute governments, whether hereditary or representative, the division of the powers of government is unimportant; because that body in which resides the *superior*

*authority, can, at will, make it supreme,* and *absorb* all the other departments. It does not follow, therefore, that because the British Parliament, whose supremacy is acknowledged, decides questions of private right and puts that decision, as it does its other determinations, into the form of a statute, that whatever it does is legislative in its nature. It can adjudicate and often does substantially adjudicate when it professes to enact new laws. That faculty is *expressly denied* to our Legislature, as much as legislation is denied to our Judiciary. Whenever an Act of Assembly, therefore, is a decision of titles between individuals, or classes of individuals, although it may in terms purport to be the introduction of a new rule of title, it is essentially a judgment against the old claim of right; which is not a legislative, but a *judicial function.*"

This question was more fully elaborated in the remainder of the opinion, citing: Anon. in 1 Hay. Rep., 29; (2 N. C.) Den. on Dem. *Bayard v. Singleton,* Martin's case, (1 N. C.,) 48; *University v. Foy,* 1 Mur. (5 N. C.,) 58 and Hay. (3 N. C.,) 310; *Hamilton v. Adams,* 6 N. C., 161; *Allen v. Peden,* 4 N. C., 638; *Robinson v. Barfield,* 6 N. C., 391.

The Court thus plainly and directly asserts its jurisdiction to pass upon the constitutionality of any act of the Legislature, and to declare such act null and void when constitutionally objectionable. It then proceeds to hold that an officer has a qualified right of property in his office which the Courts will protect even against legislative interference. It says further, on page 17: "The sole enquiry that remains is, whether the office of which the act deprives Mr. Henderson, is property. It is scarcely possible to make the proposition clearer to a plain mind, accustomed to regard things according to practical results and realities, than by barely

stating it.   For what is *property;* that is, what do we under-
stand by the term ?   It means, in reference to the thing,
whatever a person can possess and enjoy by right; and in
reference to the person, he who has that right to the exclu-
sion of others, is said to have the property.   That an office
is the subject of property thus explained, is well understood
by everyone, as well as distinctly stated in the law books from
the earliest times.   An office is enumerated by·commenta-
tors on law among *incorporeal* hereditiments; and is defined
to be the right to exercise a public or private employment, and
to take the fees and emoluments thereunto belonging. (2 Bl.
Com., 36).   \*   \*   \*   For if one usurp an office which
belongs to another, the owner may have an *action* for *damages*
for the expulsion, for the fees of office received, and a rem-
edy by *quo warranto* to enquire into the right of the usurper,
and by *mandamus* to be himself restored.   When we find
these remedies established to enforce the right of admission
into office, to secure the possession of it and its emoluments,
we can no longer doubt that in law, an office is deemed the
subject of property to the officer, as well as an institution for
the convenience of the people.   If it be so, it falls within
those provisions of the Constitution which secure private
interests; and can not be divested without some default of the
officer, or the *cesser* of the office itself.   These are the gen-
eral principles that lead the Court to the conclusion that the
act of Assembly *is invalid."*

Some of the italics are mine.   This decision was rendered
at the December Term, 1833, reported in 15 N. C., 1. Since
that time there have been five separate and distinct Constitu-
tional Conventions, *all* of which might, but *none* of which
*have,* abrogated or modified the principles of that opinion.

In 1835 a Constitutional Convention met on June 4th, and
framed amendments to the Constitution of 1776, which were

ratified by the people.   In 1861 a Convention met and on
May 20th passed the Ordinance of Secession, with some other
amendments, none of which were submitted to the people.
In 1865 a Convention met on October 9th, repealed the Ordi-
nance of Secession and passed an ordinance prohibiting
slavery.   This Convention reassembled in May 1866 and
further amended the Constitution; but with the exception of
the above ordinances relating to secession and slavery, the
amendments were rejected upon submission to the people.

A Convention, called by General Canby, under the recon-
struction acts of Congress, assembled on January 14, 1868,
and framed the "Constitution of 1868," which was ratified
by the people.   In 1875 a Convention assembled on Sep-
tember 6th, and amended the Constitution in several particu-
lars, their action being ratified by the people at the election of
1876.   In addition to these Conventions, several amendments
have been made by legislative action and popular ratification,
such as the celebrated "Free Suffrage" amendment of 1854,
and those prohibiting the payment of the special tax bonds,
relating to the election of trustees of the University, increas-
ing the number of Justices of the Supreme Court, and some
relating to other particulars set out principally in Chapters
81, 82, 83, 84, 85, 86, 87, and 88, of the Laws of 1872-73.
The various amendments made many changes of far reach-
ing results, including the successive repudiation of the gov-
ernments of the United States and of the Confederate States,
but the underlying principles of *Hoke v. Henderson* remained
unchanged.   In fact, the Convention of 1835, by necessary
implication, appears to have endorsed the opinion.   Assem-
bling within less than eighteen months after its rendition,
Judge Daniel and Judge Gaston, though still Justices of the
Supreme Court, appeared as delegates to the Convention from
their respective Counties of Halifax and Craven, and actively

participated in its deliberations.   In fact, Judge Gaston, as Chairman and spokesman of the Committee appointed "to consider and report the manner in which it will be expedient to take up the business of this Convention," became its leading spirit.

In *Hoke v. Henderson,* on page 23, this Court positively asserted the independent life tenure of the judicial office, as being "constitutional and unalterable," and free from any legislative control; but declined to express an opinion as to whether the Legislature could reduce their salaries under Article XXI, of the Constitution of 1776, which provided "that the Governor, Judges of the Supreme Court of Law and Equity, Judges of Admiralty and Attorney General, shall have *adequate* salaries during their continuance in office." With Daniel and Gaston upon the floor, and the opinion fresh in their memory, the Convention expressly provided in Art. III, Section 2, that: "The salaries of the Judges of the Supreme Court, or of the Superior Courts, shall not be diminished during their continuance in office." This practically completed the independence of the Judiciary.   I have thus carefully reviewed the case of *Hoke v. Henderson* in connection with its surroundings because the present dissent is in effect a direct attack upon the fundamental principles involved in that case.   We are told that "the *supreme* power in every Government of every kind is the law-making power, wherever it may be vested." That is true, because it is vested in the people; but it is *not true* that the people exercise this power *supremely* through their representatives in the Legislature.   This *supreme* law making power they exercise only through a Constitutional Convention or by ratification upon a direct referendum to themselves.   The law making power granted to the Legislature is carefully restricted.   In the Constitution the word *"Supreme"* is nowhere applied to

the Legislature ; but only to the Governor and the Supreme Court. Art. II, Section 1, says that: "The *Legislative authority* shall be vested in two distinct branches, both dependent upon the people." Art. III, Section 1, says: "The Executive Department shall consist of a Governor, in whom shall be vested the *supreme* executive power of the State, etc.". Art. 4, Section 8, says: "The *Supreme Court* shall have jurisdiction to review, upon appeal, any decision of the Courts below, upon any matter of law or legal inference."

Art. I, Section 8, says: "The legislative, executive and *supreme judicial* powers of the Government ought to be forever separate and distinct from each other." Article I, the "Declaration of Rights," comprises thirty-seven sections, nearly all of which necessarily apply to the legislative authority alone; while its last Section closes with the significant declaration that: "This enumeration of rights shall not be construed to *impair* or *deny* others retained by the people; and *all powers not herein delegated, remain with the people."* The first Section of the Declaration says: "That we hold it to be self evident that all men are created equal; that they are endowed by their Creator with certain *unalienable* rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." This is an express declaration that there remain in the citizen certain inherent rights that are independent even of constitutional recognition. Again we are now told that "The Legislature is the great and chief department of Government." The people have not said so in their Constitution, but have said directly to the contrary, as it provides for three coordinate departments, which shall be forever separate and distinct. In my opinion there could be no political heresy more dangerous than to assert the superiority of any one department; because, as is well said by Chief Justice RUFFIN,

"that body in which resides the *superior* authority, can at will make it *supreme,* and absorb all the other departments. Again, we are now told that this Court has no powers except those given by the Constitution; but we are expressly given jurisdiction over all matters of *law or legal inference,* and what greater powers could be given to us of a judicial nature?

Again, we are now told, but not by counsel, that we are liable to impeachment. Of course we are. No man in this country is above the law; and as, holding the supreme judicial power, we can not try ourselves nor try each other for our judicial acts, there must be some tribunal to which we are amenable. I am sure there is no member of this Court would have it otherwise; and while we would scorn to let the fear of possible consequences influence our action in the slightest degree, we shall be ever ready to answer before any legitimate tribunal, and meet the fullest consequences of our deliberate act. This is no mark of legislative superiority, but simply a wise provision for that just responsibility which should attach to every public servant.

Again, we are now asked why is the opinion of *Hoke v. Henderson* so sacred. I have endeavored to answer in the preceding pages; but in any event, why is it less sacred now than it was two years ago when it received the *unanimous* endorsement of this Court? If it was sacred enough two years ago to keep in Bellamy, why is it not sacred enough now to keep in Wilson? Again, it is now said that in *Hoke v. Henderson* there was no attempt to abolish the office, and that we have extended the principle to cases wherein the office is professedly abolished. But this extension was made two years ago by a *unanimous* Court in *Wood v. Bellamy.* While this case may be somewhat different in the application of the principle, the principle itself is the same; as I see no practical difference between abolishing and recreating the office in

successive sections of the same act, and accomplishing the same result by means of two successive acts.

It is needless to review the facts of the case at bar, as in that respect I can add nothing to the opinion of the Court. My object now is to state the basis of my judgment not only in this, but in all other cases of a similar nature. I can not but feel that a great principle is at stake, one vitally affecting the integrity and independence of this Court. In this connection I take the liberty of inserting an extract from the admirable address of Hon. Junius Davis, recently delivered before us in presenting the portraits of Judges Iredell and Moore, as follows:

"In 1786, following the passage of the Confiscation Acts, the question of the power of the Court to declare void an Act of the Legislature because in conflict with the Constitution, was raised in this State by some of the bar, and was vigorously supported by Iredell in an exceedingly strong and able pamphlet published by him."

In the celebrated case of Doe on Dem., of *Bayard v. Singleton,* 1 Martin, 41, in which Iredell, Johnston and Davie were counsel for plaintiffs, and Moore and Nash for defendant, that question was first discussed and decided in the Courts of this State. In reading the report of this case, one is struck with the great and proper reluctance of the Judges to approach the decision of the point, so novel and strange. They suggested to the litigants first one and then another method of compromise and settlement, but driven to it, at last faced the issue manfully as true men. Mr. Haywood in his argument in *Moore v. Bradley,* 2nd Haywood, 140, attributes the merit of that opinion to Judge ASHE, and says that he illustrated his opinion by this forcible language: "As God said to the waters, 'so far shall ye go and no further,' so said the people to the Legislature."

124—46

"Afterwards, when upon the Supreme Bench of the United States, in *Calder v. Bull,* 3 Dallas, 386, and again in *Chisholm v. Georgia,* IREDELL took occasion to declare in emphatic language his opinion to be 'If any act of Congress or of the Legislature of a State, violates those constitutional provisions, it is unquestionably void; though I admit, that as the authority to declare it void is of a delicate and awful nature, the Court will never resort to that authority but in a clear and urgent case. This doctrine so clearly and admirably stated in these few and concise words is now the law in every State in this Union, and is universally taken to have been so settled by the opinion of MARSHALL in *Marbury v. Madison,* 1 Cranch, 137. I can not but think it singular that in his opinion in this case MARSHALL makes no reference whatever to either of the three cases above mentioned or to the earlier cases in Rhode Island and Virginia. The language of Iredell in *Caldwell v. Bull* is so clear cut and logical that it could not have escaped the notice of the Chief Justice. In our busy life we seldom pause to reflect upon the far reaching results, the inestimable blessings of these decisions. How often in our history has Congress and Legislature in the mad lust of power and the wild riot of party hate striving to accomplish unholy and unwholsome legislation, been halted by the stern mandate, 'so far shall ye go and no further.'

"England's greatest statesman once said, 'the honest man may in his cottage bid defiance to all the forces of the Crown —it may be frail, its roof may shake, the wind may blow through it, the storm may enter, the rain may enter, but the King of England may not enter; all his forces dare not cross the threshold of the ruined tenement.' But this vaunted liberty of the British subject can bear no comparison with that of the American citizen, who, dwelling under the shadow of

the mighty Constitution is secured by it in the fullest enjoyment of his life, his property and his liberty." These words seem the more forceable because they deal with a great principle, and had no intentional reference to the case at bar.

In conclusion, I can only repeat what was said when speaking for the Court in *Caldwell v. Wilson,* 121 N. C., 425, 471; "We realize the responsibilities of this Court in settling the line of demarcation between the legislative, executive and supreme judicial powers, which, by constitutional obligation, must be kept forever separate and distinct. This vital line must be drawn by us alone, and we will endeavor to draw it with a firm and even hand, free alike from the palsied touch of interest or subserviency and the itching grasp of power."

I concur in the opinion of the Court.