State on the relation of D. H. ABBOTT v. E. C. BEDDINGFIELD.

(Decided November 21, 1899.)

*Quo Warranto—Tenure of Office—Statutes In Pari Materia —Railroad Commissioners.*

1. Contemporaneous legislation about the same subject matter is *in pari materia,* and may be read and construed together. *Wilson v. Jordan,* 124 N. C., 683.

2. A public office, to which there is attached a salary, is a vested interest. *Hoke v. Henderson,* 15 N. C., 1.

3. A change of the name from Railroad Commission to that of Corporation Commission does not deprive the relator of his office. *Day's case,* 124 N. C., 362. Neither does the addition of some new duty to the office have that effect; neither does a statute professing to repeal the former act, but which in reality is merely amendatory thereof, have such effect.

CIVIL ACTION in the nature of *quo warranto,* instituted in WAKE Superior Court, at July Term, 1899, before *Moore, J.,* and a jury trial being waived, was by consent, heard upon the pleadings.

The plaintiff alleges in his complaint, that by the Act of 1891, chap. 320, a Railroad Commission was established, and that in March, 1897, he was duly elected a Commissioner, his term of office commencing April 1, 1897, to continue six years, and that he entered upon his office and discharged its duties up to April 4, 1899. That the defendant, claiming to be authorized under Act of 6th March, 1899, entitled "An act to repeal the Railroad Commission," also an act of the same date, entitled "An act to establish the North Carolina Corporation Commission," unlawfully intruded upon and usurped his office, and still holds the same.

The defendant, answering the complaint, relies upon the authority of the Acts of 1899 for his right to the office now held by him.

Upon the pleadings and admissions his Honor rendered judgment in favor of defendant and against the relator. The relator excepted and appealed.

*Messrs. MacRae & Day, Argo & Snow,* and *J. C. L. Harris,* for plaintiff (appellant).

*Messrs. Simmons, Pou & Ward, J. N. Holding* and *J. H. Flemming,* for appellee.

FURCHES, J., writes the opinion of the Court.

MONTGOMERY, J., writes concurring opinion in the result.

CLARK, J., writes dissenting opinion.

FURCHES, J. The General Assembly of 1891, chap. 320, passed and ratified an act establishing a Railroad Commission, to consist of three Commissioners. Under the provi-

sions of this act the relator, Abbott, on the . . . . day of March,
1897, was duly elected one of the three Commissioners, pro-
vided for in the act, for a term of six years thence next
ensuing. Under this election he was, on the 1st day of
April, 1897, duly qualified and inducted into said office, and
continued therein and performed the duties thereof and exer-
cised the powers and privileges pertaining to said office until
the 1st of April, 1899, when the defendant, Beddingfield, as
the relator alleges, (with the aid and connivance of the other
two members of said Commission) unlawfully entered into,
took possession of, and ousted the relator of his said office;
and that the said Beddingfield continues to unlawfully hold
said office, and to prevent the relator from entering into the
same or to exercise the duties and functions thereof.

The defendant admits that he entered into the office and
ousted the relator therefrom. But he says he did so with
authority of law, and that he is now, and has been, lawfully
holding and performing the duties and exercising the func-
tions of said office, ever since he so lawfully entered into the
same.

The defendant says the General Assembly, on the 6th day
of March, 1899, passed an act (chap. 506), which repealed
the Act of 1891 (chap. 320), under which the relator was
elected; and that on the 6th of March, 1899, said General
Assembly passed another act (chap. 164), which established
a "Corporation Commission" to consist of three Commis-
sioners, and that he was duly elected, qualified and inducted
into said office under said Act of the 6th of March, 1899, and
rightfully holds the same and exercises the duties and func-
tions of said office under said act and said election.

We note the fact that the defendant alleges in his answer
that chap. 506 was passed and ratified on the 4th day of
March, 1899. But there is no finding of the Court as to this

allegation, the burden of which was on the defendant.    And
as it appears from the printed volume of the Laws of 1899
that it was ratified on the 6th day of March, 1899, we will so
treat it (although it is probable that it is not very material
whether it was passed on the 4th or the 6th).

This brings us to the consideration of the question pre-
sented and ably argued on both sides, as to whether the legis-
lation of 1899, chap. 506, and chap. 164, repealed the Act of
1891, chap. 320, and the acts amendatory thereof or supple-
mentary thereto.    As important as this question is, to our
minds, it has in principle, been decided by this Court in a
number of cases, and it is only necessary that we should refer
to some of these cases and apply the principles announced in
them to the present case.

It seems to us that no one can read the Acts of 1899, chap.
506 and 164, without coming to the conclusion that it was not
the purpose of the Legislature to abolish the Railroad Com-
mission—the duties and functions of that institution or Com-
mission, but to abolish—to change—the officers holding and
exercising the duties and functions of the Commission.    And
in saying this we must not be understood as criticising the
action of the Legislature or impugning its motives in passing
these acts.    We have no doubt but what those voting for these
acts thought they had the right to do this, and to put the
office the relator held in the hands of a party in harmony
with the political sentiment of that party which controlled
the Legislature; that they thought this legislation constitu-
tional, or that they were at the time inadvertent to the ques-
tion of its constitutionality.    *King v. Hunter,* 65 N. C., 603.
But it presents this question for our determination so far as
it affects the rights of the relator.    This is the question before
us, and we consider it with a view to this single question.
If it is unconstitutional as to him—if it does not affect his

vested right of property in this office he was holding—then we see no constitutional objection to this legislation. But, on the other hand, if it does affect his vested rights and takes from him his office with its emoluments, before the expiration of the term for which he was elected, then, to that extent, it is unconstitutional and void.

Chap. 506, and chap. 164, both passed and ratified on the 6th day of March, 1899, are *in pari materia* and must be read and considered together for the purpose of ascertaining their meaning. *Wilson v. Jordan,* 124 N. C., 687; *Rhodes v. Lewis,* 80 N. C., 136. When these acts are read together, it is seen that, on the same day (March 6, 1899), the Legislature, professing to repeal the Act of March, 1891, under which the relator, Abbott, claims to hold, re-enacted the Act of 1891, in almost the very words in which it was originally enacted, and which was a part of the statute law of the State on the 6th of March, 1899. Indeed, it does more than this: The Legislature of 1897 passed an amendment to the Act of 1891 (chap. 206), extending very greatly its jurisdiction and powers. This amendatory Act of 1897 (chap. 206), gave the Railroad Commission jurisdiction over street railways, express and telegraph companies, and power to require telegraph companies to extend their lines and establish new agencies, to make rules for receiving, forwarding and delivering messages, and makes a violation of these rules a penalty. None of these powers did the Railroad Commission have under the original Act of 1891.

The 42nd section, chap. 169, of the Acts of 1897, by express terms, made the Railroad Commission a board of appraisers of railroad property in these words: "Shall constitute a board of appraisers and assessors for railroad, telegraph, canal and steamboat companies."

The Act of 1899, chap. 164, which was passed the same

day of the repealing act, in declaring the powers of the Commission, re-enacts the statute claimed by defendant to be repealed, in sec. 23, on p. 295, in the following words: "To perform all the duties and exercise all the powers imposed or conferred by chapter three hundred and twenty (320) of the Public Laws of eighteen hundred and ninety-one and the acts amendatory thereto."

Here we have an act professing to repeal chap. 320, Acts 1891, and in an act passed the same day, and under which the defendant claims to hold his office, it is re-enacted with all amendments thereto. Thus we see that the Act of 1891 (chap. 320), is expressly re-enacted and continued in force by the Act of 1899, chap. 164. *State v. Williams,* 117 N. C., 753; *Wood v. Bellamy,* 120 N. C., 224; *Wilson v. Jordan, supra.*

The Act of 1899, chap. 164, does not constitute the Corporation Commission a board of appraisers of railroads, etc., and it seems to be at least doubtful whether chap. 11, sec. 41, or any other section of that act constitutes the "Corporation Commission" a board of appraisers and assessors for railroads, telegraphs, canals and steamboat companies, as the Act of 1897, chap. 169, sec. 42, did. And if the Corporation Commission is considered a thing separate and distinct from the Railroad Commission, and the Act of 1891, establishing the Railroad Commission, and the acts amendatory thereof, are repealed—dead, and of no validity—it is at least doubtful whether the Corporation Commission has jurisdiction to assess the taxes on railroads, etc., which constitutes the principal powers and duties of the Commission. But if the legislation of 1899, chaps. 506 and 164, are construed to be amendments to the Act of 1891, establishing the Railroad Commission, and to the Act of 1897, which amended the Act of 1891, then the powers of the Commission to assess the

taxes on railroads, etc., it would seem, are ample and undisputed.

Why is this not the proper construction to put upon this legislation? We see by an examination of the Act of 1891, establishing, the Railroad Commission, and the Act of 1899, which the defendant claims established the Corporation Commission, that they are in *substance* the same. This will fully appear by reading the two acts together, observing the following order of sections:

| ACT OF 1891. | ACT OF 1899. |
|---|---|
| Section  1 becomes | Section 1 embodying Act of April 1, 1891, making Court of Record. |
| Section  2 becomes | Sections 31, 30 and 29. |
| Section  3 becomes | Section 12. |
| Section  4 becomes | Section 13. |
| Section  5 becomes | Section  2, in part. |
| Section  6 becomes | Section 14. |
| Section  7 becomes | Section  7. |
| Section  8 becomes | Last part of Section 1. |
| Section  9 becomes | Section  6. |
| Section 10 becomes | Section 15. |
| Section 11 becomes | Section 16. |
| Section 12. becomes | Section 26 and Section 33. |
| Section 14 becomes | Section 17. |
| Section 15 becomes | Section 27. |
| Section 16 becomes | Section  9. |
| Section 17 becomes | Section 18. |
| Section 19 becomes | Section 8. |
| Section 20 becomes | Section 2, subsections 13 and 14. |
| Section 21 becomes | Section 19. |
| Section 22 becomes | Section 20. |
| Section 23 becomes | Section 11. |

| ACT OF 1891. | ACT OF 1899. |
|---|---|
| Section 24 becomes | Section 21. |
| Section 25 becomes | Section 22. |
| Section 26 becomes | Section 2, subsections 8 to 11. |
| Section 27 becomes | Section 10. |
| Section 28 becomes | Section 32. |
| Section 29 becomes | Section 28. |
| Section 30 becomes | Section 24. |
| Section 31 becomes | Section 25. |

This reference is made to show how completely the Act of 1891 is incorporated in the Act of 1899; while to our minds it was hardly necessary to be referred to for the purpose of showing their identity, after it had been shown that the Legislature of 1899, in the very act under which the defendant claims to hold, had in so many words re-enacted the Act of 1891, and the amendments thereto.

It is established to be the law of this State by *Wood v. Bellamy*, 120 N. C., 221; *Day v. State Prison*, 124 N. C., 362; *Wilson v. Jordan*, 124 N. C., 683, that an act is not repealed by the Legislature's saying it is repealed, when the same act or contemporaneous acts show that it is not repealed. And it is established to be the law of this State by *Wilson v. Jordan, supra*, and the authorities there cited, and by *Arendell v. Worth*, at this term, that contemporaneous legislation about the same subject matter is *in pari materia*, and may be read and construed together.

It is established law in this State by *Hoke v. Henderson*, 15 N. C., 1, which has been approved in as many as forty cases decided by this Court, as shown in the concurring opinion of Justice DOUGLAS in *Wilson v. Jordan*, by *Wood v. Bellamy*, and *Day v. State Prison, supra*, that a public office, to which there is attached a salary, is a vested interest—a prop-

erty in the holder, and as such property holder, he is protected by the law and Constitution' of this State and the laws and the Constitution of the United States.

It is the settled law of this State, *Wood v. Bellamy, Day v. State Prison,* and *Wilson v. Jordan, supra,* that the change of the name from Railroad Commission to that of Corporation Commission does not deprive the relator of his ' office—his legal and constitutional rights to hold said office.

If we consider the two Acts of 1899 *in pari materia,* and read them together, as we are bound to do, unless we disregard all the former decisions of this Court, we find that the two Acts of 1899 did not repeal the Act of 1891 or the Act of 1897, but are amendatory thereof; that the re-enactment of the Act of 1891 and the Act of 1897, amendatory thereof, in the same legislation that it is contended by defendant repealed them, had the effect to continue in force the Acts of 1891 and 1897. *State v. Williams, supra.*

So it seems to us that every material point in this case has been passed upon and decided by the cases we have cited, and that the relator is entitled to recover of the defendant. the office sued for, unless it shall appear that there is something—some fact—shown by the defendant that distinguishes this case from the principles decided in the cases cited.

We now propose to consider those facts and the law arising thereon called to our attention, and claimed by defendant to distinguish this case from those cited, or at least to those that seemed most relied upon in the argument. We would consider them all if we thought it material to the defendant to do so.

And it is interesting to see how many things can be suggested, and how many reasons can be assigned by able and ingenious counsel on the argument of an important case like this.

The first ground taken by defendant was an attack on *Hoke v. Henderson.* This we will not notice further than to say that if any doctrine can be firmly settled in this Court, it is that of *Hoke v. Henderson,* which in our opinion is able to stand alone. But it certainly should be considered by the profession to be settled, when it appears that it has been cited with approval in more than forty cases, and not a single *decision* of this Court to the contrary.

Next, the cases of *Ewart v. Jones* and *Cook v. Meares,* are relied on as authority for defendant—when these cases show that no such doctrine as *Hoke v. Henderson* was presented in either of these cases; nor is *Hoke v. Henderson* referred to, nor the doctrine involved in that case; it was not invoked, considered or passed upon in either of them.

Next, the cases of *Wood v. Bellamy, Day v. State Prison,* and *Wilson v. Jordan,* are relied on as authority for the defendant. This may seem strange, when these cases were expressly decided on the doctrine of *Hoke v. Henderson.* It is thought by the learned counsel for defendant that they can see some *shade of distinction* between some expressions used in writing the opinions in those cases and the present case. They say that it is said the "offices are identically the same." It is also said they are *substantially* the same. But suppose the term "substantially the same" had not been used by the Court in writing those opinions: Could that make them authority for the defendant in this case? If he had other authorities sustaining the contention of the defendant, this criticism, it seems to us, might have been made to distinguish the cases of *Wood v. Bellamy, Day v. State Prison* and *Wilson v. Jordan* from this case, and to weaken it as authority for the plaintiff. And we can only see how the defendant may use it in this way, in this argument—not as authority for his position, but only, if possible, to weaken it as authority for the plaintiff.

But the practice of the learned counsel for the defendant has no doubt caused him to observe that it is rarely ever the case that a case cited as a precedent—as authority—is *identical* with the case under discussion, to sustain which it is cited. But it is where the principle involved in the case cited is the same or *substantially* the same as in the case under discussion. That is why the cases of *Hoke v. Henderson, Wood v. Bellamy* and *Wilson v. Jordan* were cited by the plaintiff—because they decide the *principle* that the relator of the plaintiff had an interest, a property, in the office sued for that could not be taken from him and given to the defendant. If it be true, as contended by the defendant, that the addition of a few more powers and duties in the Act of 1899 repealed the old act and created a new institution—a new board—why is it that the Act of 1897 (chap. 206) which increased the powers and jurisdiction of the old Board more than the Act of 1899 increases the powers and jurisdiction of the Corporation Commission over those of the old Board, did not have the effect of destroying the old Board? Yet this was never contended or even thought of so far as we know; while it would seem that if this contention of the defendant be true, it would have had that effect.

If this contention of defendant be true, why does not the extension of the powers and duties of sheriffs and clerks have the effect of abolishing their offices and turning them out? If this were so, we would have no more trouble with *Hoke v. Henderson* and *Wood v. Bellamy*. All that would be necessary to do would be for the Legislature to add some new duty to the office, and out the incumbent would go.

The next and last stand the learned counsel for defendant makes is that this Court has, in effect, repudiated the doctrine of *Hoke v. Henderson* and *Wood v. Bellamy* in the case of *Ward v. Elizabeth City*, 121 N. C., 1, and defendant con-

tends that the Court can not decide this case for the plaintiff without overruling *Ward v. Elizabeth City.* The learned counsel must have overlooked the fact that *Hoke v. Henderson* and *Wood v. Bellamy* are both cited with approval in *Ward v. Elizabeth City,* and it is distinguished from those cases in the following language: "This case differs from *Wood v. Bellamy,* 120 N. C., 212, in that, there the new charter was so nearly a repetition of the old one that it was held to be merely an amendment of the former one, not a destruction of it, and hence the offices under such charter were not vacated. The only restriction upon the legislative power is that after the officer has accepted office upon the terms specified in the act creating the office, this being a contract between him and the State, the Legislature can not turn him out by an act purporting to abolish the office but which in effect continues the same office in existence. This is on the ground that an office is a contract between the officer and the State, as was held in *Hoke v. Henderson,* 15 N. C., 1, and has ever since been followed in North Carolina down to and including *Wood v. Bellamy.*" It would therefore seem that *Ward v. Elizabeth City* is not in conflict with *Hoke v. Henderson* and *Wood v. Bellamy,* and does not overrule or repudiate the doctrine announced in those cases, but it expressly adopts and approves of the doctrine announced in those cases. And instead of sustaining the defendant's contention, it is authority for the plaintiff's contention. So we see nothing in the facts of this case, nor in the authorities cited by the defendant that distinguishes this case from *Hoke v. Henderson, Wood v. Bellamy, Day v. State Prison* and *Wilson v. Jordan.* This being so, those cases must control our judgment in deciding this case.

There is error in the judgment appealed from, and the

ABBOTT *v.* BEDDINGFIELD.

relator is entitled to the relief demanded in his complaint—to enter upon and to exercise the rights and functions of his said office and to discharge the duties of said office and to receive the emoluments thereof. The defendant, Beddingfield, is not entitled to have and to hold said office, nor to the emoluments thereof. Let judgment be entered here and the writ to issue from this Court.

Error.

MONTGOMERY, J., concurring. I concur in the result, but I do not wish to be bound by that part of the opinion in which is discussed the motives of the members of the General Assembly in the enactment of chap. 164 of the Laws of 1899; nor do I think it is my part, in a judicial opinion, to make any explanations for them.

CLARK, J., dissenting. The Bill of Rights of the freemen of North Carolina (Constitution, Art. I, sec. 9), reads: "All power of suspending laws, or the execution of laws, by *any authority* without the consent of the representatives of the people is injurious to their rights and ought not to be exercised." This is copied *verbatim* from the great Bill of Rights of 1688, and sums up in four and a half lines the result of two great struggles carried on by our ancestors in England to maintain the right of the people to place their will on the statute book and have it executed without hinderance by, or permission of, *any authority* whatever. In those great struggles the people triumphed; one King lost his head, and his son not profiting by his experience, lost his kingdom, and his descendants to the latest generation were wanderers and aliens in the earth. The result summed up by Lord Somers in the above terse lines was placed in the people's Magna Charta, and has been retained by us, as a memorial,

like the twelve stones set up by the twelve tribes at the cross-
ing of Jordan, of the sufferings in the terrible wilderness
through which our fathers passed, that the people should
enjoy the privilege of making their own laws and managing
their own affairs in their own way.   It is also a warning to
all in any authority that the will of a free people is the
supreme law and that none shall interfere with the execution
thereof.   It would be to small advantage that the power to
nullify and suspend or set aside the execution of the laws
"without the consent of the representatives of the people" was
taken at such cost from the King with the Judges to aid him,
if the Judiciary can now construe that they possess that
power which was expressly denied when attempted to be exer-
cised by them in conjunction with the Executive.   The heart
still beats with emotion at the memory of the trial of the seven
Bishops, when the Judges conspired with the King to punish
the defendants for having protested against the suspension by
him of the execution of laws passed by the representatives
of the people—we still feel a glow of pride over that sturdy
English jury who by their verdict rebuked King and Judges,
and saved to the English-speaking race the right to make
their own laws, and to have them executed.

  That the people of North Carolina never intended to give
this power to the Judges, which our ancestors had denied to
the King and his Judges, is further evidenced by the 8th sec-
tion of the Bill of Rights:   "The legislative, executive and
supreme judicial powers of the government ought to be for-
ever separate and distinct from each other."   A more com-
plete inhibition upon the courts against their interfering with
acts of the legislative department, by annulling them or set-
ting aside their execution, could not be penned.

  Nor is this all.   So jealous were the people of their hard-
won right to govern themselves through their own represent-

atives freely elected, that the 2nd section of the Bill of Rights reads, "All political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted wholly for the good of the whole;" and sec. 3 reads, "The people of this State have the *inherent, sole and exclusive* right of regulating the *internal* government and police thereof, and of ordering and abolishing their Constitution and form of government whenever it may be necessary for their safety and happiness; but every such right should be exercised in pursuance of law, and consistently with the Constitution of the United States."

In the nature of things "regulation of internal government" and the expression of the people's will can only be made by legislation, and what that legislation shall be depends upon the Legislature. No power is anywhere conferred upon any authority to stay such legislation, but there is an express prohibition. There are limitations in the Constitution upon the power of the Legislature, but none as to abolishing offices or changing the incumbents, except as to officers named expressly in the Constitution. That such should be named and the Legislature forbidden to interfere with them is a recognition that, as to all other officers, the Legislature, representing the untrammeled will of the people, could, from time to time abolish such offices or change the incumbents. Every person who has taken an office not named in and protected by the Constitution, has taken it with a knowledge that by the above constitutional provisions the people were left free to act from time to time as they saw fit in regard to such offices.

In the present case, the Legislature has seen fit to abolish the Railroad Commission, in which the plaintiff was a Commissioner, and to create a Corporation Commission, to whom

were given the powers of the former Railroad Commission, the powers formerly exercised by the Bank Examiner (whose office, like that of Railroad Commissioner, is abolished), and sundry other important duties and powers formerly exercised by the State Treasurer and State Auditor. The Commissioners of this new Corporation Commission (of whom the defendant is one), were elected temporarily by the Legislature till the next general election, when the people themselves are to fill those positions at the ballot box.

The plaintiff asks the Court to declare that this "regulation of the internal government" of the State is null and void, though guaranteed by the Bill of Rights, sec. 3; that though "all government originates from the people only, and is founded upon their will only" (Bill or Rights, sec. 2),they can not exercise that will by abolishing the Railroad Commission and creating a Corporation Commission; that though "the legislative, executive and supreme judicial powers are forever separate and distinct" (Bill of Rights, sec. 3), the judicial department can, in this respect, invade the legislative department and set aside their legislation because the Court can divine that "the purpose of the Legislature was not to abolish one Commission and create another with different powers," as the Legislature declared, but that it was in truth to "displace the plaintiff and put in the defendant;" that though the blood-bought hereditament of a free people handed down from the destruction by our ancestors of the Stuart power and dynasty forbids "any authority" to "suspend the laws or the execution of the laws, *without the consent of the representatives of the people,*" yet this Court can say that the action of those representatives in placing the election to the office of Corporation Commissioners in the people at the ballot box, shall be suspended till the expiration of the term which the plaintiff claims in the abolished office of Railroad Commissioner.

The claim of such high prerogative in this Court, a power of which the Court itself is to be sole judge, and which is subject to no review by any body whatever, a power which orignates in and is to be declared at the will of a majority of this Court, a power which makes that majority and not the will of the people the supreme power in the State, must be clearly and unmistakably expressed in the Constitution. But an examination of that instrument shows not a line, not a hint that any power is conferred upon the Court to set aside any act of the Legislature, in any case, as unconstitutional. It rests upon "the imperturbable perpendicularity of assertion" on the part of the plaintiff.

The learned Chief Justice who wrote the decision in *Hoke v. Henderson,* when in maturer age and with ripened wisdom he had returned to the bench as Associate Justice, thus wrote, with more justice and discernment of the powers of the Legislature: "When, therefore, the Constitution vests the legislative power in the General Assembly, it must be understood to mean that power as it has been exercised by our forefathers before and after their migration to this continent." *Caldwell v. Justices,* 57 N. C., 324.

But the plaintiff's counsel insists that for a hundred years the courts have been declaring acts of legislation unconstitutional. Such authority has never been exercised by any Judge in England or in any of her world-wide colonies, and yet they have preserved constitutional liberty without paternal guardianship exercised by the courts over the Legislature. It has been asserted in this country, by judicial assumption, without a line in any Constitution to confer it, or to recognize it since its assumption; yet no court outside of North Carolina has ever claimed that the alleged power to set aside legislative action ever went so far as to declare unconstitutional legislation abolishing or changing officials in offices created by

the Legislature; on the contrary, every court to which the question has been presented has strongly denied such power to be in the courts, and so has every text-writer. And none more strongly than Chief Justice MARSHALL in the celebrated Dartmouth College case when holding that the Legislature could not impair the provisions of a charter, he expressly says that the decision does not restrict the right, which Legislatures unquestionably have, to change or abolish officers, since they are governmental agencies, and that they hold by virtue of no contract.

In reply to the express provisions of the State Constitution which prohibit the courts to interfere with legislation in any respect and the uniform decisions of all other courts that the power to declare legislation unconstitutional does not extend to legislation affecting offices not created by the Constitution, since such legislation is purely governmental and rests solely with the legislative department, there is but one reply offered us: "It was otherwise decided by *Hoke v. Henderson.*" That this decision upon a question of constitutional law, common to all the States and to the Federal Government also, should stand out in contradiction to all the decisions of all the courts of the other States, would alone suffice to make us doubt its soundness and reconsider its foundation. Without questioning the conceded ability of the Court which rendered it, the three lawyers then filling that bench can not be asserted to have possessed attainments and abilities overmatching the vast array of eminent men on the benches of like tribunals in the other States, and upon the Supreme Federal Bench, who with absolute unanimity hold that the doctrine asserted in *Hoke v. Henderson* is itself unconstitutional.

Let us examine it with unbiased minds. In *Hoke v. Henderson,* the Court says that property in public office is acquired

by contract. As to future earnings there is no "law of the land" to prohibit the Legislature impairing that which has not yet been earned, except the contract clause of the United States Constitution. The impairment of contracts is prohibited (not by any provision of the State Constitution, but), only by the provision of the United States Constitution, Art. I, sec. 10, clause 1, that "no State shall pass any law impairing the obligation of contracts." It is thus the Federal Constitution that is invoked to nullify State legislation. It is a rule that the construction placed by the State Supreme Court upon the Constitution of its own State will be adopted without question by the United States Courts; and for a stronger reason, the construction placed by the United States Supreme Court upon the Constitution of the United States is binding upon the State courts, else we might have as many constructions of it as there are States. Now, this very clause of the United States Constitution has been several times before the United States Supreme Court, and that high tribunal has held uniformly, notwithstanding its changes of personnel, from the decision of Chief Justice MARSHALL down to the present, that the clause in the United States Constitution prohibiting any State from passing any law "impairing the obligation of contracts" does not prohibit State Legislatures from abolishing public offices or changing their incumbents without abolishing the offices, for that within the meaning of that clause "public office is not a contract." This should surely be final and conclusive—the uniform construction by the United States Supreme Court of the meaning of a clause in the United States Constitution. It will be sufficient to cite a few cases:

In *Butler v. Pennsylvania*, 10 Howard (51 U. S.), 402, the Court says: "The contracts designed to be protected by the 10th section of the first article of that instrument are con-

tracts by which *perfect rights, certain, definite, private rights* (italics in original) of property are vested. These are clearly distinguishable from measures or engagements adopted or undertaken by the body politic or State Government for the benefit of all, and from the necessity of the case, and according to universal understanding, to be varied or discontinued as the public good shall require...... It follows then upon principle that in every perfect and competent government there must exist a general power to enact and to repeal laws, and to *create and change* or discontinue the agents designated for the execution of those laws. Such a power is indispensable for the preservation of the body politic and for the safety of the individuals of the community. It is true that this power or the extent of its exercise may be controlled by the organic law or Constitution of the State, as is the case in some instances in the State Constitutions......but where no such restriction is imposed, the power must rest in the discretion of the government alone. The Constitution of Pennsylvania contains no limit upon the discretion of the Legislature, either in the augmentation or diminution of salaries, with the exception of those of the Governor, the Judges of the Supreme Court, and the Presidents of the several Courts of Common Pleas. The salaries of those officers can not under that Constitution be diminished during their continuance in office. Those of all other officers are dependent upon legislative discretion. We have already shown that the appointment to and *tenure* of an office created for the public use and the regulation of the salary affixed to such an office do not fall within the meaning of the section of the Constitution relied on by the plaintiffs in error; do not come within the import of the term *contracts* (italics in original) or in other words the vested, private, personal rights thereby intended to be protected. They are functions appropriate

to that class of powers and obligations, by which governments are enabled and are called upon to foster and promote the general good; *functions therefore which governments can not be presumed to have surrendered, if indeed they can under any circumstances be justified in surrendering them."* Then the Court goes on, after saying "this doctrine is in strict accordance with the rulings of this Court in many instances," (citing cases), and expressing "surprise" that it should be again presented, to quote with approval the following from *Commonwealth v. Bacon,* 6 S. & R., 322: "The services rendered by public officers do not, in this particular, partake of the nature of contracts, *nor have they the remotest affinity thereto;"* and also quotes with approval the following extract from *Commonwealth v. Mann,* 5 W. & S., 418: "If the salaries of Judges and their title to office could be put on the ground of contract, then a most grievous wrong has been done them by the people, by the reduction from a tenure during good behavior to a tenure for a term of years. The point that it is a contract or partakes of a nature of a contract will not bear the test of examination;" and further points out that the constitutional provision, protecting terms and salaries of Governor, Judges and other constitutional officers, is a sure indication that they were not protected by being contracts, and that officers not so protected by the Constitution are left to be changed at legislative will.

This decision of the United States Supreme Court was rendered in 1850—seventeen years after *Hoke v. Henderson.* If the eminent Court that rendered the latter decision had had the benefit of this construction by the United States Supreme Court of the "contract" clause of the United States Constitution, as we have, we may feel sure they would have rendered a different decision—as we should do.

In 1879 the same point was before the United States

Supreme Court in *Newton v. Commissioners,* 100 U. S., 548, in which the Court says: "The principle laid down in the Dartmouth College case, and since maintained in the cases which have followed and been controlled by it, has no application where the statute in question is a *public law* relating to a *public subject* within the domain of the general legislation of the State and involving the *public rights* and *public welfare* (all these italicized as in original) of the entire community affected by it. The two classes of cases are separated by a broad line of demarcation. The distinction was forced upon the attention of the Court by the argument in the Dartmouth College case, by Mr. Chief Justice MARSHALL". (Here the Court quotes at length from that decision which draws the line between private contracts which are protected and "other contracts than those which respect property, or some object of value, and confer rights which may be asserted in a court of justice,") and adds: "The judgment of the Court in that case proceeded upon the ground that the college was (quoting MARSHALL), 'a private eleemosynary institution, endowed with a capacity to take property for purposes *unconnected with the government* (italics in original) whose funds are bestowed by individuals on the faith of the charter.' "

In the same case, 100 U. S., at p. 559, it is said: "The legislative power of a State, except so far as restrained by its own Constitution, is *at all times absolute with respect to all offices within its reach.* It may at pleasure create, or abolish them, or modify their duties. *It may also shorten or lengthen the term of service.* And it may increase or diminish the salary or change the mode of compensation." *Buller v. Pennsylvania,* 10 Howard, 402. "The police power of the States, and that with respect to municipal corporations, and to many other things that might be named, are of the

same absolute character.    Cooley Const. Lim.,232, 342 ; *The Regents v. Williams,* 4 Gill. & J., (Md.), 321.

"In all these cases, there can be no contract and no irrepealable law, because they are 'governmental subjects' and hence within the category before stated."

In *Crenshaw v. United States,* 134 U. S., 99, (1889), the point was again before the Court, and Mr. Justice LAMAR, speaking for a unanimous Court, quotes from and approves the two cases above cited (*Butler v. Pennsylvania,* 10 Howard, 402, and *Newton v. Commissioners,* 100 U. S., 548), and holds that "an officer appointed for a definite time or during good behavior has no vested interest or contract right of which he can not be deprived by subsequent legislation," and sums up his able opinion in this emphatic sentence, "*Whatever the form of the statute the officer under it does not hold by contract.   He enjoys a privilege revocable by the sovereignty at will; and one Legislature can not deprive its successor of the power of revocation.*"

Whence then does this Court get any power to declare null and void the statute abolishing the plaintiff's office, or (even if it were true) placing the plaintiff in it ?   The State Constitution not only does not protect the plaintiff in a legislative office, but forbids the Court to stop the execution of any law. The United States Constitution, as uniformly construed by the highest court, does not protect him ; for it says, "No office is a contract," but that all officers whose terms are not fixed by the Constitution may be changed or abolished at the will of the Legislature.

This surely should be conclusive of the controversy. Every other court, and every text-writer holds the above views.    See list of cases cited in Throop Public Officers, secs. 19 and 345 ; Meacham Public Officers, secs. 5 and 465 ; Black Constitutional Law, 530 ; Black Constitutional Prohibitions, 114 ;

19 A. & E., 562 C.; Cooley Const. Lim., 336; (star page 276), in which that eminent jurist sums up the authorities as above, and quotes from Chief Justice MARSHALL, in the Dartmouth College case, 4 Wheaton, 629: "The framers of the Constitution did not intend to restrain the States in the regulation of their civil institutions, adopted for internal government."

With the legal ability of the entire world arrayed against the plaintiff's contention, his counsel simply says, "we rely upon *Hoke v. Henderson.*" It is but justice to the Court which rendered that decision to again say that they did not have the benefit of the full light which has been shed upon us. Few State courts had then passed upon the question, and none of the decisions of the United States Supreme Court which have since so clearly and unmistakably held that an office is not a contract within the meaning of the Federal Constitution. There is no dogma of "judicial infallibility," and if there had been, that Court did not believe they possessed it, for they overruled several of their own decisions, and there is a long list of other decisions of theirs which have been overruled by their successors.

But it is said that the decision in *Hoke v. Henderson* has been quoted some forty times. It has been often cited, but many times incidentally or to show it did not apply. An examination will show that it has been quoted as direct authority, prior to the present year, less than a dozen times. But forty times zero is zero still, and the decision being based entirely upon an erroneous construction of the United States Constitution, as shown by the subsequent decisions of the United States Supreme Court, the repetition of the error leaves it an error still.

In matters of practice, mere routine of the courts, a line of decisions once established is followed till changed by

statute or rule of court that the change may be prospective. The same is true of decisions affecting contracts and private rights generally. They become rules of property; men act upon them and contract with reference to them. But in constitutional questions, the Constitution itself is the guide, not the glosses of the courts. We can not "make the word of none effect by our traditions." The decisions of the courts are the "traditions of the elders." The Constitution itself is the higher authority. Just as the Scriptures still speak for themselves and are not to be held changed by erroneous constructions which from time to time have been placed upon them by men of unquestioned ability and sanctity; or, as President Lincoln said in his inaugural address, speaking of constructions placed by the court upon the Constitution: "Such matters are never settled, till they are settled right;" or, as Chief Justice CHASE and Justices MILLER and FIELD said, in *Washington v. Rouse,* 8 Wallace, 441, when protesting against a decision which restricted the powers of the Legislature: "With as full respect for the authority of former decisions as belongs, from teachings and habit, to Judges trained in the common-law system of jurisprudence, we think that there may be questions touching the power of legislative bodies which can never be closed by the decisions of the court, and that the one we have here considered is of this character."

The decision in *Hoke v. Henderson* being contrary to the subsequent construction placed upon the "contract" clause of the Federal Constitution by the United States Supreme Court, it would be impossible for any court to hold with *Hoke v. Henderson* if it were a new question to-day. The same reason requires it to be overruled that the "word" not the traditions of men should control. But aside from that, the decision itself is illogical and incoherent and can not be

sustained by any process except that of saying *ipse dixit.* It is true that a most respectable Court wrote it. No one doubts their ability or their respectability. Even Homer sometimes nodded. That Court was able, but they wrote some decisions which they themselves held incorrect, and many others their successors have held incorrect. The decision must stand or fall upon its own merits or demerits. It can have no vicarious righteousness imputed to it. What is this much-talked-of decision which is invoked to stay the hand of the people equally when they would change their management of the penitentiary, their court system, the management of the railroads owned by the State, the educational system of the State, the supervision of the shell-fish industry of the State, or the supervision and regulation of railroads, telegraphs, telephones and express companies, and their charges and their assessment for taxation? From the expenditure of hundreds of thousands of dollars of tax money upon convicts and courts, and the management of the property of the State, down to offices paying $6 and $8 salaries per year, whenever the people have put forth their hand to change the management, this Court is invoked to stop the execution of the people's will; not by virtue of a provision of the State Constitution, for, admittedly, there is none; not by virtue of any provision of the Constitution of the United States, for the United States Supreme Court says there is none that confers that power; but by virtue of a decision of a Court two-thirds of a century ago. Thus, the imposition of the dead hand of the past is invoked to deny the constitutional rights of the living.

But take the decision as an original proposition; ought it to stand or should it be overruled as so many others, rendered by the same Court, have been? It holds that a public office is a private contract, and therefore property of the officeholder.

With strange inconsistency, it holds that the office can be abolished, but that, if another is put in the office, the first holder can claim the emoluments. Can that be sustained? If the office is a contract, if it is property, the rights of the holder surely are as much violated by the destruction of the office and the loss of the property as when it is transferred to another. Again, if it is a contract, it is a contract for employment, and every one knows that the remedy for a breach of such contract is not a decree of court to put out the new employee and to put in the old one, but a judgment for damages, and no judgment for damages can be given against the State, which is besides, not a party to the action though the treasury is ordered (by this indirect method) to pay the salary of a public agent whom the State has discharged. Besides, if public office is private property (or as the current phrase goes " if public office is a private snap") surely it can be bought and sold, for what property a man has, he has an inalienable right to dispose of, yet if it were attempted, the recreant officeholder would find himself indicted. It says the salary may be reduced, but if it is a contract how is that possible? If it were property, then surely upon the death of the incumbent it would go to his executor or administrator. Indeed, the decision is logical in this respect, for the Court which had strongly expressed the opinion that public offices should be held for life, says (15 N. C., bottom of page 23) : "For an absolute term of years it could not be granted; as upon the death of the officer, it would in that case go to his executor, which would be inadmissible since the office concerns the administration of justice and an incompetent person might be introduced into it." The provision in the statute which the Court there condemned was that "the duly elected Clerk of the Court shall continue in office for the term of four years next after qualification," without adding, "determina-

ble upon death," yet every officeholder in North Carolina who holds a term to-day has it prescribed in the words the Court condemns in *Hoke v. Henderson.*   Will any court follow that decision in holding that on the death of any incumbent his office goes to his executor. or administrator ?   In *London v. Headen,* 76 N. C., 72, it was held that one who had been elected constable was liable to a penalty for refusing to accept and qualify.   This recognized the true ground that public office is an agency, a duty or privilege to serve the State, and the salary is the compensation the State allows, for certainly no one could be punished for refusing to enter into a contract with the State.   There are other inconsistencies in the decision, but is it such a perfect specimen of infallibility that, by virtue of it, this Court, contrary to the prohibitions in the State Constitution, contrary to the construction since placed by the Supreme Court of the United States upon the Federal Constitution, can invade the legislative department, suspend the execution of the laws passed by it, and prohibit the penal institutions of the State, its educational system, the control of State property, the administration of justice, passing into the hands of those whom the people through their representatives have selected for the performance of public service in regard to them ?

But it is said that *Hoke v. Henderson* is a precedent as to construction of the Constitution. · There can be no judicial precedent that can avail against the express letter of the Constitution.   Besides, that argument can not be addressed to this Court.   In 1866, legislation was adopted (Code, secs. 38 and 3448) whereby to save taxpayers the punishment of paying fines, costs and orders of maintenance for insolvent convicts, the courts were empowered to order that if those adjudged to pay should fail or be unable to pay in money, they should work out the amount on the public roads.   This

legislation was held constitutional in *State v. Palin,* 63 N. C., 471, (in 1869), and has been uniformly so held ever since, by unanimous courts, down to and including *State v. Nelson,* 119 N. C., 797. This constitutional precedent has been overruled at this term in *State v. White,* though in doing so the Court has disregarded the reasonable doubt as to the unconstitutionality of the statute, which must exist when the courts have held it valid for a third of a century; whereas, to overrule *Hoke v. Henderson,* would not do violence to that canon of construction, for, on the contrary, it would be holding constitutional legislation which *Hoke v. Henderson* held unconstitutional—and the presumption is always in favor of the constitutionality of legislation.

But it is further urged that the legislative department has acquiesced in *Hoke v. Henderson.* The repeated cases in which counsel claim that that case has been followed show by the constant litigation arising from that ill-starred decision, that there has been a continuous struggle between the people acting through their Legislature and the courts. In this very year, the numerous cases which have come before us show that the Legislature has not yet acquiesced or have thought they had avoided the restrictions of that decision. In neither case can it be said there was legislative acquiescence in the correctness of the decision. But in truth there has been an open disavowal of the principle of *Hoke v. Henderson* by the Judiciary of this State and by the people themselves, to which, by some oversight, no one has yet called attention. If the tenure of office is protected only by being fixed in the Constitution, that is a prohibition against legislation in regard to it, but is no prohibition upon a Convention abolishing such office in forming a new Constitution, or changing its occupants. But if, on the other hand, under the ruling in *Hoke v. Henderson,* public office is also a contract, then it

is protected by the contract clause of the United States Constitution, and a State can no more impair its obligation by an ordinance of a Convention than by an act of the Legislature. *Louisiana v. Taylor,* 105 U. S., 445; *White v. Hart,* 13 Wall., 646; *Clay Co. v. Society,* 104 U. S., 519. "No *State* shall pass any law impairing the obligation of a contract." Now in 1865, by authority of the President of the United States, a Convention was called in North Carolina to establish a State Government. Among other things, it elected for life terms three Supreme Court Judges, and eight Superior Court Judges. That government remained in force till abrogated by the Convention of 1868. All the acts of the executive and legislative departments of the State, and all the decisions of the courts from 1865 to 1868 have ever been held valid and binding. All contracts of the State during those years are valid. If public office is a contract, then the Judges and other officers were protected against these contracts being impaired by the Convention of 1868. In the matter of Hughes, 61 N. C., 57, PEARSON, C. J., held that the Convention of 1865 was " a rightful Convention of the people," and the officers chosen by it were not merely *de facto* but *de jure.* On page 74, he calls attention to the fact that Congress as well as the President had recognized and confirmed the action of the Convention, and on page 75, closes the opinion by saying that if the Convention was rightfully convened (as he had just held) "It is certain it had power to adopt all measures necessary and proper for filling the offices of the State, which is the only question now under consideration." If public office was a contract then the attempt of the Convention of 1868 to provide new Supreme Court and Superior Court Judges, and other public functionaries, with exactly the same titles, exactly the same duties and powers and compensation, in the place of those elected in 1865, was a nullity,

and we must either hold that the occupants of the Supreme and Superior Court bench, who went into office by virtue of the authority of the Convention of 1868, were conscious usurpers of other men's property, or they repudiated the *Hoke v. Henderson* doctrine that public office was private property.

But it may be said by those who do not recollect, or have not examined, that the action of the Convention of 1868 in vacating these and other offices was by the *vis major* of an Act of Congress. If Congress had so enacted, it had no power to authorize a State to pass an act impairing the obligation of a contract. But in fact no act of Congress required the vacation of any office by the Convention of 1868. The sole requirement in the Act of Congress (chap. 153, sec. 5, ratified March 2, 1867, and chap. 6, ratified March 23, 1867), was that the new Constitution should be framed by a Convention elected by voters, without regard to color, and the Act of Congress admitting the State to representation in Congress (chap. 70, ratified June 25, 1868), contains only one "fundamental condition," which is thus expressed: "That the Constitutions of neither of said States shall ever be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote in said State, who are entitled to vote by the Constitution thereof, herein recognized, except as punishment for crime, etc." The requirement of Congress was solely directed to the right of suffrage, with no exaction as to vacation of offices. In removing, therefore, the life Judges, Supreme and Superior, who had been elected in 1865, and had taken their seats, the new Judiciary declared most unequivocally that the *Hoke v. Henderson* doctrine that public office was held by contract was overruled.

It is matter of astonishment that, after that date, anyone

could be found to urge before the courts that *Hoke v. Henderson* was an authority in North Carolina.

If *Hoke v. Henderson,* for any one of the above reasons, should not be regarded.as law, then the whole of the frail scaffolding upon which the plaintiff's case rests goes down.

But even if it were possible for it to stand, still the plaintiff could not recover, for *Hoke v. Henderson* only held that an officer, whose office had been transferred to another, was still entitled to receive its emoluments, for it says (15 N. C., bottom of page 21),. that the "property" in the office is the right to receive its compensation. Clearly that, in no aspect, would oust the defendant whom the State could also pay; nor would it deny to the people their right to elect a Corporation Commissioner at the next general election.

In *Day's* case, 124 N. C., 362, the doctrine of *Hoke v. Henderson* received a sudden and vast expansion, for it was then held for the first time that the dismissed officeholder was entitled, if his "duties" were continued in any guise, no matter among how many it was divided. As the duties of almost any office which is abolished (whether for economy or any other reason), must necessarily be devolved upon some one, this made it almost impossible for the Legislature to abolish any office during the term of the incumbent, though *Hoke v. Henderson* had expressly held that any office, not created by the Constitution, could be abolished at the will of the Legislature.

The doctrine of *Hoke v. Henderson* received a still further expansion in *Wilson v. Jordan,* 124 N. C., 683, in which the doctrine of *in pari materia* was held to apply, and hence if an office was abolished, yet if the Legislature, at that or a subsequent term, legislated upon the same subject matter, the act abolishing the office would be held null, and the officer reinstated, not merely in the receipt of his salary, but in the per-

ABBOTT *v.* BEDDINGFIELD.

formance of the duties of the similar office under the new statute.

But far as these two cases expanded the doctrine of *Hoke v. Henderson,* they still fall short of being sufficient to sustain the plaintiff's claim, unless there is another expansion. The Railroad Commission was abolished, afterwards a Corporation Commission was created, to which were entrusted the duties formerly discharged by the Railroad Commission plus the duties of the former Bank Examiner (whose office is abolished), plus certain duties formerly discharged by the State Treasurer, plus certain duties formerly discharged by the State Auditor, plus some entirely new duties. If the plaintiff can claim the office of Corporation Commissioner because all his duties are performed by the new Commissioner, the Bank Examiner, with equal force, may claim that he also is entitled to the defendant's office because all his duties are embraced in those entrusted to the Corporation Commission; and the State Treasurer and the State Auditor might also make like claim because certain of their duties have likewise been transferred and swallowed up.

If, when the whale swallowed Jonah, he was in law merely a continuation of Jonah, how shall we decide when this whale has swallowed two Jonahs and parts of two others? Which one is he?

In a late case in the United States Circuit Court it was held that the Railroad Commission and the Corporation Commission were not the same body, and that was given as a reason why the State Treasury should lose the assessed taxation upon twelve millions of railroad property, that is, that other taxpayers should make it good, while now, this Court is asked to hold that the two Commissions are one and the same body, and therefore the plaintiff is entitled to the office of Corporation Commissioner to which the Legislature elected the defendant. The people have been "lost in the shuffle."

To ask the Court to hold that the plaintiff is entitled to the title, powers and pay of Corporation Commissioner because he was a member of the Railroad Commission, which was abolished and its duties transferred, among others, to the Corporation Commission, is to ask it not only to deny the Legislature the right to legislate in matters purely governmental, but is asking the Court to legislate by giving to the plaintiff the powers of a former Bank Examiner and the duties transferred from the Treasurer and Auditor and the new duties, for as to none of these is there now or has ever been a shadow of legislative authority given the plaintiff to discharge them. If such expansion can be given to the incorrect but moderate doctrine of *Hoke v. Henderson,* then legislation will not depend upon the will of the people at the ballot box in electing their representatives in a legislative body, but upon what the majority of this Court may let the Legislature enact— or in the striking language of some recent opinions "what effect we will give to the statute."    The statute should get its effect from its passage and ratification by those elected to pass legislation.    The courts are given no power to interfere—are expressly prohibited from so doing.    When the Federal Constitution is invoked as giving the Court, notwithstanding, power to interfere, we find the United States Supreme Court saying that the section invoked confers no power on the courts in respect to legislation as to public offices, or other "governmental" legislation.

If this Court has the power claimed by the plaintiff, then already power has passed "from the many to the few."    The supreme power is not in the people to be enacted into law by their representatives, but in the irreviewable action of a majority of the Supreme Court of the State who can declare legislation invalid as rapidly as it is enacted.    If this doc-

125——19

trine of public office being a contract, expanded as asked by
the plaintiff, is correct, then a party or a machine whose con-
duct has disgusted the people may fill every office for eight
years, for twenty years, or for life (as in *Hoke v. Hender-
son*), and snap their fingers in the face of the people, for
under *Day's* case the office remains as long as the duties sur-
vive, and under *Wilson v. Jordan* it remains as long as there
is any legislation on the same subject matter, or *in pari
materia.*

Nay, more, if some vast trust, some powerful combination
of capital, shall elect one Legislature, it can fill the offices for
life, and a generation of men must pass away without any
voice in, or control of, the government they created; for even
a constitutional convention can not vacate offices, if office is
a contract. Or if the same oppressive combination shall suc-
ceed in nominating and electing three members of this bench,
it can, through them, for eight years at least, nullify and set
aside any act of legislation which they may deem proper to
hold unconstitutional. The only safeguard is the Constitu-
tion, which confides legislation to the Legislature, and makes
all legislation repealable. It was this very evil of interfer-
ence with the right of the people to legislate that caused the
historic struggles in England whose result is condensed into
sec. 9 of our Bill of Rights. The whole system of our free
government is summed up in sec. 2 of the Bill of Rights
already quoted, i. e.: "All political power is vested in and
derived from the people; all government of right originates
from the people, is *founded upon their will only,* and is insti-
tuted for the good of the whole," that is to say, that the will
of the people when expressed through their representatives in
the General Assembly, is 'the law. Legislatures are not
always true to their trust, but the remedy provided by the
Constitution is not to submit their work for approval and

validation to any three men or five men, which would be an oligarchy, but to submit it to the approval and endorsement of the real sovereign, the people, at the next general election, who will elect new representatives, who will set aside, change or approve what has been done. So far from reducing the legislative department to subordination to the will of the Judiciary, the newer State Constitutions are increasing the control of the people over their Legislatures by requiring specified acts to be submitted by a referendum to an immediate vote of the people (as is the case with the pending constitutional amendment in this State), instead of waiting for a general referendum of their action in the election of new representatives. Whatever tends to increase the power of the Judiciary over the Legislature diminishes the control of the people over their government, negatives the free expression of their will, is in conflict with the spirit and the express letter of the organic law and opposed to the manifest movement of the age. As was well said by FAIRCLOTH, C. J., in *Ewart v. Jones,* 116 N. C., 570 (since cited with approval by DOUGLAS, J., in *Caldwell v. Wilson,* 121 N. C., 470): "Under our form of government the sovereign power resides with the people and is exercised by their representatives in the General Assembly. The only limitation upon this power is found in the organic law as declared by the delegates of the people in Convention assembled."

When our State Government was formed at Halifax, in 1776, representative government was new, and property owners fearful to trust the people, and the masses were generally illiterate. As a consequence, by that Constitution the people were given the election of only one officer in the government, i. e., the member of the lower house of the General Assembly, the members of the State Senate being elected by those owning fifty acres of land and over; the Governor and

other State officers, including the Judges and Solicitors, were elected, at second hand, by the Legislature, the Judges being chosen for life. The Justices of the Peace were also elected for life by the General Assembly, and all the county officers were elected by the Justices, their election being thus three removes from the then untrusted people. The Justices of the Peace elected the Clerk of the County Court for life, and the Judges appointed the Clerks of the Superior Courts for the same term. With the increase of education among the people and the experience of their capacity for self-government, there was a movement for a betterment of this condition, though it was retarded by the fear inspired by the excesses of the French revolution. In 1829, the election of sheriffs and constables was given to the people. In 1832, the Clerks of the Superior and County Courts were made elective by the people for terms of four years. All the Judges at that time were elected by the Legislature for life, and the courts were not then, as now, created by the Constitution, but the Supreme Court, itself, was a legislative enactment. The Judges, educated under the old system of distrust of the capacity of the people for self-government, looked around for some brake to put upon the radical movement which (as it must have seemed to them) threatened society. They hit upon property in office acquired by contract with the State, and the "contract" clause of the Federal Constitution (which had not then, as now, been distinctly held by the United States Supreme Court not to apply to offices) and rendered the decision in *Hoke v. Henderson,* which has been a clog upon legislation ever since, and a fruitful source of litigation. In that opinion, the Judges frankly say that the proper tenure of office is for life. But progress went on. In 1833 constables were made elective by the people, and in 1835, the election of Governor was given to the people. In 1854, free suf-

frage was adopted and the 50-acres freehold required as a qualification for electors for the State Senate was abolished. In 1868, the election of the State officers (except that of Governor already conferred in 1835), and of the Judges, Solicitors and Justices of the Peace and Coroners and County Commissioners was given to the people. In 1899, the election of the Commissioners of Agriculture and of Labor, and Corporation Commissioners was given to the people, and the plaintiff is fighting against that—claiming that the abolition of his office and creation of a larger office, the Commissioners of which are to be elected by the people, is a violation of his rights, and invokes *Hoke v. Henderson.* That decision was erroneous and illogical when made, has since been so demonstrated by the United States Supreme Court, and is inconsistent with itself. But if it were correct, it does not cover the plaintiff's case.

The same progress made in the acquisition of control of the government by the people in the State has taken place in the Federal Government. In the United States Constitution of 1787, only one officer, the member of the lower house of Congress, was made elective by the people. The Senators were chosen at second hand by the State Legislatures, and the President at second hand by electors, while the Judges were selected at three removes from popular election, being appointed for life by the President and confirmed by the Senate. The people quickly made the election of President practically direct in themselves by reducing the electors to shadows. An amendment to elect Senators by the people has repeatedly passed the lower house of Congress, and must soon pass the Senate. The election of Judges by the people, and for a term of years instead of for life, has been adopted by nearly all the States, and evidently must soon become an issue as to the United States Judges.

In other nations, the same movement to place the control of government in the people has taken place. A late historian (McKenzie), says: "Sixty years ago, Europe was an aggregation of despotic powers, disposing at their pleasure of the lives and property of their subjects........ To-day, the men of all Europe (outside of Russia and Turkey) govern themselves. Popular suffrage, more or less approaching universal, chooses the governing power, and by methods more or less effective, dictates its policy." In recent years, Brazil, the only monarchy in South America, has become a republic, and even Japan now elects a parliament.

In the face of this well-nigh universal concession of the right of the people to manage their own affairs, the plaintiff calls upon this Court to declare and use a paternal power of supervising and setting aside the action of the representatives of the people of North Carolina lawfully assembled in legislative session and legislating upon governmental matters, and he does this upon the alleged authority of *Hoke v. Henderson,* which, if it applied to his case, has been discredited and disavowed by the United States Supreme Court, since holding that the clause of the United States Constitution does not apply to offices.

I am not denying the propriety of the Judiciary declaring legislation unconstitutional within the fixed limits that have been always recognized by the courts, but I am protesting against the extension of the claim. Inasmuch as the power is not based upon any express authority in the Constitution, its exercise at all depends upon the acquiescence of the other departments of the government, and its extension to purely governmental matters, such as offices and the like, jeopardizes its extinction. It is a power that can not be enforced when denied by the Legislature.

In holding the act of the Legislature in question unconsti-

tutional, the Court has disavowed any intention thereby to reflect upon the members of the General Assembly. With the same disavowal of any reflection upon my brethren, but with an equal right to my opinion, I think the Legislature has not acted unconstitutionally or beyond its powers, as construed by the highest court in the land, but that, on the contrary, it is this Court which has acted unconstitutionally and exceeded the powers confided to it, and in so doing has violated four separate sections of the guarantees given in the Bill of Rights.

When a court, acting within its jurisdiction, renders an erroneous judgment, it must still be obeyed; but when it acts beyond its jurisdiction and in violation of the limits placed upon it by the Constitution, its decrees are null and void, and are no protection to anyone who acts under them. Suppose a court should give a direct judgment against the State for a sum of money, would the Treasurer be safe in paying it? Whether those who have intruded into offices which the Legislature in the exercise of its just powers has confided to others have made themselves liable to removal by impeachment, and whether the Treasurer who shall pay salaries to others than those the Legislature has directed him to pay shall be held liable to account for the money paid out contrary to legislative enactment, is a matter, in my opinion, for the Legislature to determine; for even *Hoke v. Henderson* holds that the Legislature can direct payment of a salary to anyone, and can withhold payment at its will.

The rights guaranteed the people by their Bill of Rights were won by our ancestors after long years of suffering and sacrifice. These safeguards can not be lightly abandoned. In North Carolina, as in England, it must be settled whether the people can place their will upon the statute book and have it executed, or whether there is "any authority" which can

stop the execution of the laws. The question is a most grave and serious one, reaching in its consequences far beyond the present litigation and the parties to it, for it involves from top to bottom the right of popular self-government. The vast importance of the principle involved, and respect for my oath of office and fidelity to the trust confided to me by the people have compelled me to speak fully and plainly, but I hope not harshly.